LOCAL 357, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSE-MEN AND HELPERS OF AMERICA, v. NATIONAL LABOR RELATIONS BOARD.

No. 64. Argued February 28, 1961.—Decided April 17, 1961.*

*Together with No. 85, *National Labor Relations Board* v. *Local 357, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, also on certiorari to the same Court.

*Herbert S. Thatcher* argued the cause for the Union. With him on the brief was *David Previant.*

*Norton J. Come* argued the cause for the National Labor Relations Board. With him on the brief were *Solicitor General Rankin, Stuart Rothman, Dominick L. Manoli* and *Duane B. Beeson.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioner union (along with the International Brotherhood of Teamsters and a number of other affiliated local unions) executed a three-year collective bargaining agreement with California Trucking Associations, which represented a group of motor truck operators in California. The provisions of the contract relating to hiring of casual or temporary employees were as follows:

"Casual employees shall, wherever the Union maintains a dispatching service, be employed only on a seniority basis in the Industry whenever such senior employees are available. An available list with seniority status will be kept by the Unions, and employees requested will be dispatched upon call to any employer who is a party to this Agreement. Seniority rating of such employees shall begin with a minimum of three months service in the Industry, *irrespective of whether such employee is or is not a member of the Union.*

"Discharge of any employee by any employer shall be grounds for removal of any employee from seniority status. No casual employee shall be employed by any employer who is a party to this Agreement in violation of seniority status if such employees are available and if the dispatching service for such employees is available. The employer shall first call the Union or the dispatching hall designated

by the Union for such help. In the event the employer is notified that such help is not available, or in the event the employees called for do not appear for work at the time designated by the employer, the employer may hire from any other available source." (Emphasis added.)

Accordingly the union maintained a hiring hall for casual employees. One Slater was a member of the union and had customarily used the hiring hall. But in August 1955 he obtained casual employment with an employer who was party to the hiring-hall agreement without being dispatched by the union. He worked until sometime in November of that year, when he was discharged by the employer on complaint of the union that he had not been referred through the hiring-hall arrangement.

Slater made charges against the union and the employer. Though, as plain from the terms of the contract, there was an express provision that employees would not be discriminated against because they were or were not union members, the Board found that the hiring-hall provision was unlawful *per se* and that the discharge of Slater on the union's request constituted a violation by the employer of § 8 (a)(1) and § 8 (a)(3) and a violation by the union of § 8 (b)(2) and § 8 (b)(1)(A) of the National Labor Relations Act, as amended by the Taft-Hartley Act, 61 Stat. 140–141, as amended, 29 U. S. C. § 158.[1] The

---

[1] Section 8 provides in relevant part:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

. . . . .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . .

Board ordered, *inter alia,* that the company and the union cease giving any effect to the hiring-hall agreement; that they jointly and severally reimburse Slater for any loss sustained by him as a result of his discharge; and that they jointly and severally reimburse all casual employees for fees and dues paid by them to the union beginning six months prior to the date of the filing of the charge. 121 N. L. R. B. 1629.

The union petitioned the Court of Appeals for review of the Board's action, and the Board made a cross-application for enforcement. That court set aside the portion of the order requiring a general reimbursement of dues and fees. By a divided vote it upheld the Board in ruling that the hiring-hall agreement was illegal *per se.* 107 U. S. App. D. C. 188, 275 F. 2d 646. Those rulings are here on certiorari, 363 U. S. 837, one on the petition of the union, the other on petition of the Board.

Our decision in *Carpenters Local 60* v. *Labor Board,* decided this day, *ante,* p. 651, is dispositive of the petition

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 . . .

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership . . . ."

Section 7 provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a)(3)."

of the Board that asks us to direct enforcement of the order of reimbursement. The judgment of the Court of Appeals on that phase of the matter is affirmed.

The other aspect of the case goes back to the Board's ruling in *Mountain Pacific Chapter,* 119 N. L. R. B. 883. That decision, rendered in 1958, departed from earlier rulings [2] and held, Abe Murdock dissenting, that the hiring-hall agreement, despite the inclusion of a nondiscrimination clause, was illegal *per se:*

> "Here the very grant of work at all depends solely upon union sponsorship, and it is reasonable to infer that the arrangement displays and enhances the Union's power and control over the employment status. Here all that appears is unilateral union determination and subservient employer action with no aboveboard explanation as to the reason for it, and it is reasonable to infer that the Union will be guided in its concession by an eye towards winning compliance with a membership obligation or union fealty in some other respect. The Employers here have surrendered all hiring authority to the Union and have given advance notice via the established hiring hall to the world at large that the Union is arbitrary master and is contractually guaranteed to remain so. From the final authority over hiring vested in the Respondent Union by the three AGC chapters, the inference of encouragement of union membership is inescapable." *Id.,* 896.

The Board went on to say that a hiring-hall arrangement to be lawful must contain protective provisions. Its views were stated as follows:

> "We believe, however, that the inherent and unlawful encouragement of union membership that stems from unfettered union control over the hiring process

[2] See *Hunkin-Conkey Constr. Co.,* 95 N. L. R. B. 433, 435.

would be negated, and we would find an agreement to be nondiscriminatory on its face, only if the agreement explicitly provided that:

"(1) Selection of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on, or in any way affected by, union membership, bylaws, rules, regulations, constitutional provisions, or any other aspect or obligation of union membership, policies, or requirements.

"(2) The employer retains the right to reject any job applicant referred by the union.

"(3) The parties to the agreement post in places where notices to employees and applicants for employment are customarily posted, all provisions relating to the functioning of the hiring arrangement, including the safeguards that we deem essential to the legality of an exclusive hiring agreement." *Id.,* 897.

The Board recognizes that the hiring hall came into being "to eliminate wasteful, time-consuming, and repetitive scouting for jobs by individual workmen and haphazard uneconomical searches by employers." *Id.,* 896, n. 8. The hiring hall at times has been a useful adjunct to the closed shop.[3] But Congress may have thought that it need not serve that cause, that in fact it has served well both labor and management—particularly in the maritime field and in the building and construction industry.[4] In the latter the contractor who frequently is a stranger to the area where the work is done requires a "central source" for his employment needs;[5] and a man

[3] Fenton, Union Hiring Halls Under the Taft-Hartley Act, 9 Lab. L. Jour. 505, 506 (1958).

[4] Cf. *id.,* at 507. For expression of such view see S. Rep. No. 1827, 81st Cong., 2d Sess., pp. 4–8; Goldberg, The Maritime Story (1958), pp. 277–282.

[5] Fenton, *op. cit., supra,* note 3, at 507.

looking for a job finds in the hiring hall "at least a minimum guarantee of continued employment." [6]

Congress has not outlawed the hiring hall, though it has outlawed the closed shop except within the limits prescribed in the *provisos* to § 8 (a)(3)." [7] Senator Taft made clear his views that hiring halls are useful, that they are not illegal *per se,* that unions should be able to operate them so long as they are not used to create a closed shop:

> "In order to make clear the real intention of Congress, it should be clearly stated that the hiring hall is not necessarily illegal. The employer should be able to make a contract with the union as an employment agency. The union frequently is the best employment agency. The employer should be able

---

[6] *Id.,* at 507.

[7] Those *provisos* read:

"*Provided,* That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8 (a) of this Act as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9 (a), in the appropriate collective-bargaining unit covered by such agreement when made; and (ii) unless following an election held as provided in section 9 (e) within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a conditon of acquiring or retaining membership . . . ."

to give notice of vacancies, and in the normal course of events to accept men sent to him by the hiring hall. He should not be able to bind himself, however, to reject nonunion men if they apply to him; nor should he be able to contract to accept men on a rotary-hiring basis. . . .

.     .     .     .     .

". . . The National Labor Relations Board and the courts did not find hiring halls as such illegal, but merely certain practices under them. The Board and the court found that the manner in which the hiring halls operated created in effect a closed shop in violation of the law. Neither the law nor these decisions forbid hiring halls, even hiring halls operated by the unions as long as they are not so operated as to create a closed shop with all of the abuses possible under such an arrangement, including discrimination against employees, prospective employees, members of union minority groups, and operation of a closed union." S. Rep. No. 1827, 81st Cong., 2d Sess., pp. 13, 14.

There being no express ban of hiring halls in any provisions of the Act, those who add one, whether it be the Board or the courts, engage in a legislative act. The Act deals with discrimination either by the employers or unions that encourages or discourages union membership.[8] As respects § 8 (a)(3) we said in *Radio Officers* v. *Labor Board,* 347 U. S. 17, 42–43:

"The language of § 8 (a)(3) is not ambiguous. The unfair labor practice is for an employer to encourage or discourage membership by means of discrimination. Thus this section does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished

---

[8] See §§ 7 and 8, *supra,* note 1.

by discrimination is prohibited. Nor does this section outlaw discrimination in employment as such; only such discrimination as encourages or discourages membership in a labor organization is proscribed."

It is the "true purpose" or "real motive" in hiring or firing that constitutes the test. *Id.*, 43. Some conduct may by its very nature contain the implications of the required intent; the natural foreseeable consequences of certain action may warrant the inference. *Id.*, 45. And see *Republic Aviation Corp.* v. *Labor Board,* 324 U. S. 793. The existence of discrimination may at times be inferred by the Board, for "it is permissible to draw on experience in factual inquiries." *Radio Officers* v. *Labor Board, supra,* 49.

But surely discrimination cannot be inferred from the face of the instrument when the instrument specifically provides that there will be no discrimination against "casual employees" because of the presence or absence of union membership. The only complaint in the case was by Slater, a union member, who sought to circumvent the hiring-hall agreement. When an employer and the union enforce the agreement against union members, we cannot say without more that either indulges in the kind of discrimination to which the Act is addressed.

It may be that the very existence of the hiring hall encourages union membership. We may assume that it does. The very existence of the union has the same influence. When a union engages in collective bargaining and obtains increased wages and improved working conditions, its prestige doubtless rises and, one may assume, more workers are drawn to it. When a union negotiates collective bargaining agreements that include arbitration clauses and supervises the functioning of those provisions so as to get equitable adjustments of grievances, union membership may also be encouraged. The truth is that the union is a service agency that probably encourages

membership whenever it does its job well. But, as we said
in *Radio Officers* v. *Labor Board, supra,* the only encour-
agement or discouragement of union membership banned
by the Act is that which is "accomplished by discrimi-
nation." P. 43.

Nothing is inferable from the present hiring-hall pro-
vision except that employer and union alike sought to
route "casual employees" through the union hiring hall
and required a union member who circumvented it to
adhere to it.

It may be that hiring halls need more regulation than
the Act presently affords. As we have seen, the Act aims
at every practice, act, source or institution which in fact
is used to encourage and discourage union membership by
discrimination in regard to hire or tenure, term or condi-
tion of employment. Perhaps the conditions which the
Board attaches to hiring-hall arrangements will in time
appeal to the Congress. Yet, where Congress has adopted
a selective system for dealing with evils, the Board is
confined to that system. *Labor Board* v. *Drivers Local
Union,* 362 U. S. 274, 284–290. Where, as here, Con-
gress has aimed its sanctions only at specific discrimina-
tory practices, the Board cannot go farther and establish
a broader, more pervasive regulatory scheme.

The present agreement for a union hiring hall has a
protective clause in it, as we have said; and there is no
evidence that it was in fact used unlawfully. We cannot
assume that a union conducts its operations in violation
of law or that the parties to this contract did not intend
to adhere to its express language. Yet we would have to
make those assumptions to agree with the Board that it
is reasonable to infer the union will act discriminatorily.

Moreover, the hiring hall, under the law as it stands,
is a matter of negotiation between the parties. The
Board has no power to compel directly or indirectly that
the hiring hall be included or excluded in collective agree-

ments. Cf. *Labor Board* v. *American Ins. Co.*, 343 U. S. 395, 404. Its power, so far as here relevant, is restricted to the elimination of discrimination. Since the present agreement contains such a prohibition, the Board is confined to determining whether discrimination has in fact been practiced. If hiring halls are to be subjected to regulation that is less selective and more pervasive, Congress not the Board is the agency to do it.

*Affirmed in part and
reversed in part.*

MR. JUSTICE FRANKFURTER took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, concurring.

I join the Court's opinion upon considerations which, though doubtless implicit in what my Brother DOUGLAS has written, in my view deserve explicit articulation.

The Board's condemnation of these union "hiring hall" procedures as violative of §§ 8 (a)(1), 8 (a)(3), 8 (b)(1), and 8 (b)(2) of the National Labor Relations Act, as amended by the Taft-Hartley Act,[1] ultimately rests on a now well-established line of circuit court cases to the effect that a clause in a collective bargaining agreement may, without more, constitute forbidden discrimination. See, *e. g.*, *Red Star Express Lines* v. *Labor Board*, 196 F. 2d 78. While seeming to recognize the validity of the proposition that contract terms which are equivocal on their face should ordinarily await an independent evaluation of their actual meaning and effect[2] before being

---

[1] Set forth in note 1 of the Court's opinion, *ante*, pp. 669–670.

[2] As determined, for example, from the parties' actions under them, through grievance procedures, or by arbitration, if so provided in the collective bargaining agreement.

deemed to give rise to an unfair labor practice, such cases have justified short-circuiting that course upon these considerations: The mere existence of a clause that on its face appears to declare preferential rights for union members encourages union membership among employees or job applicants, persons not privy to the undisclosed intent of the parties, yet affected by the apparent meaning of the contract. Hence the mere possibility that such a clause may actually turn out not to have been administered by the parties so as to favor union members is not enough to save it from condemnation as an unlawful discrimination.

I think this rationale may have validity under certain circumstances, but that it does not carry the day for the Board in these cases. The Board recognizes, as it must, that something more than simply actual encouragement or discouragement of union members must be shown to make out an unfair labor practice, whether the action involved be that of agreeing to a contract term or discharging an employee or anything else. In this regard, it contends that the action of agreeing to the union "hiring" clause should be treated like any other employer or union action and that, on this premise, all that the Board must show in the light of *Radio Officers' Union* v. *Labor Board,* 347 U. S. 17, is that the tendency to encourage or discourage union membership was *foreseeable* to the employer or union. Since one is presumed to intend the foreseeable consequences of his acts, and since acting in order to encourage or discourage union membership is forbidden, the Board's case is said to be made by a simple showing that such encouragement or discouragement is the foreseeable result of employer or union action. The Board then concludes with a showing that encouragement of union membership is a foreseeable consequence of the acts of agreeing to or operating a union-run hiring hall.

Though, as will appear (*infra*, p. 681), I believe the Board erroneously construed this Court's decision in *Radio Officers,* I do not think we can reverse its finding of "encouragement." While I agree with the opinion of the Court that the Board could not infer from the mere existence of the "hiring hall" clause an intent on the part of employer or union to discriminate in favor of union status, I think it was within the realm of Board expertness to say that the natural and foreseeable effect of this clause is to make employees and job applicants think that union status will be favored. For it is surely scarcely less than a fact of life that a certain number of job applicants will believe that joining the union would increase their chances of hire when the union is exercising the hiring function.

What in my view is wrong with the Board's position in these cases is that a mere showing of foreseeable encouragement of union status is not a sufficient basis for a finding of violation of the statute. It has long been recognized that an employer can make reasonable business decisions, unmotivated by an intent to discourage union membership or protected concerted activities, although the foreseeable effect of these decisions may be to discourage what the act protects. For example, an employer may discharge an employee because he is not performing his work adequately, whether or not the employee happens to be a union organizer. See *Labor Board* v. *Universal Camera Corp.,* 190 F. 2d 429. Yet a court could hardly reverse a Board finding that such firing would foreseeably tend to discourage union activity. Again, an employer can properly make the existence or amount of a year-end bonus depend upon the productivity of a unit of the plant, although this will foreseeably tend to discourage the protected activity of striking. *Pittsburgh-Des Moines Steel Co.* v. *Labor Board,* 284 F. 2d 74. A

union, too, is privileged to make decisions which are reasonably calculated to further the welfare of all the employees it represents, nonunion as well as union, even though a foreseeable result of the decision may be to encourage union membership.

This Court's interpretation of the relevant statutory provisions has recognized that Congress did not mean to limit the range of either employer or union decision to those possible actions which had *no* foreseeable tendency to encourage or discourage union membership or concerted activities. In general, this Court has assumed that a finding of a violation of § 8 (a)(3) or § 8 (b)(2) requires an affirmative showing of a *motivation* of encouraging or discouraging union status or activity. See, *e. g., Labor Board* v. *Jones & Laughlin Co.,* 301 U. S. 1, 45–46; *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474. There have, to be sure, been exceptions to this requirement, but they have been narrow ones, usually analogous to the exceptions made to the requirements for a showing of discrimination in other contexts. For example, in *Republic Aviation Corp.* v. *Labor Board,* 324 U. S. 793, the Court affirmed a Board decision that a company "no solicitation" rule was overbroadly applied to prevent solicitation of union membership on company property during periods when employees were otherwise free to do as they pleased. A finding of a motivation to discourage union membership was there held unnecessary because there was no employer showing of a nondiscriminatory purpose for applying the rule to union solicitation during the employees' free time. A similar absence of a significant business justification for the employer's acts which tended to discourage union activity explains the dispensability of proof of discriminatory motivation in *Allis-Chalmers Mfg. Co.* v. *Labor Board,* 162 F. 2d 435, *Cusano* v. *Labor Board,* 190 F. 2d 898, and *Labor Board* v. *Industrial Cotton Mills,* 208 F. 2d 87.

Another field of exceptions to the requirement of a showing of a purpose to encourage or discourage union activity is found in the Court's affirmance of the Second Circuit in *Gaynor News Co., Inc.,* v. *Labor Board,* 347 U. S. 17, a companion case to *Radio Officers:* If a union or employer is to be permitted to take action which substantially—though unintentionally—encourages or discourages union activity, the union or employer ends served by the action must not only be of some significance, but they must also be legitimate, or at least not otherwise forbidden by the National Labor Relations Act. In *Gaynor* an employer who, pursuant to a nondiscriminatory business end of paying the least wages possible, agreed with the union which was the statutory representative of the employees to give certain benefits only to union members, was prevented from asserting the justifying business reasons for thus encouraging union membership because of his complicity in the union's breach of its duties as agent for *all* the employees. Indeed, the fact that a nondiscriminatory business purpose forbidden by the Act cannot be used by an employer to justify an action which incidentally encourages union membership, seems to me to be the true basis of the Court's holding in *Radio Officers* that an employer violates § 8 (a)(3) when a union forces him to take actions in order to encourage union membership. The employer's nondiscriminatory reason for encouraging union membership—to avoid the economic pressure the union could impose upon him—was surely no longer intended to be a justification for such employer action after the passage of § 8 (b)(2), a statutory provision the very wording of which presupposed that union coercion can cause a violation of § 8 (a)(3).

There is no reason to decide now whether there are other contexts in which a showing of an actual motivation of encouraging or discouraging union activity might be unnecessary to a finding of a union or employer unfair

labor practice. For present purposes, it is sufficient to note that what is involved in the general requirement of finding of forbidden motivation, as well as in the limited scope of the heretofore recognized exceptions to this general requirement, is a realization that the Act was not intended to interfere significantly with those activities of employer and union which are justified by nondiscriminatory business purposes, or by nondiscriminatory attempts to benefit *all* the represented employees. It is against this policy that we should measure the Board's action in finding forbidden the incorporation in collective bargaining contracts of the "hiring hall" clause. We must determine whether the Board's action is consistent with the balance struck by the Wagner and Taft-Hartley Acts between protection of employee freedom with respect to union activity and the privilege of employer and union to make such nondiscriminatory decisions as seem to them to satisfy best the needs of the business and the employees.

The legislative background to § 8 (a)(3) of the Act is quite clear in its indications of where this balance was to be struck. The Senate Report on this section of the original Wagner Act states:

"The fourth unfair labor practice [then § 8 (3)] is a corollary of the first unfair labor practice. An employer, of course, need not hire an incompetent man and is free to discharge an employee who lacks skill or ability. But if the right to join or not to join a labor organization is to have any real meaning for an employee, the employer ought not to be free to discharge an employee *merely* because he joins an organization or to refuse to hire him *merely* because of his membership in an organization. Nor should an employer be free to pay a man a higher

or lower wage *solely* because of his membership or nonmembership in a labor organization. The language of the bill creates safeguards against these possible dangers." S. Rep. No. 1184 on S. 2926, 73d Cong., 2d Sess. 6. (Emphasis added.)

And similarly:

"Of course nothing in the bill prevents an employer from discharging a man for incompetence; from advancing him for special aptitude; or from demoting him for failure to perform. But if the right to be free from employer interference in self organization or to join or refrain from joining a labor organization is to have any practical meaning, it must be accompanied by assurance that its exercise will not result in discriminatory treatment or loss of the opportunity for work." S. Rep. No. 573 on S. 1958, 74th Cong., 1st Sess. 11.

To the same effect was the view of Senator Walsh:

". . . The employer has the economic power; he can discharge any employee or any group of employees when their *only* offense may be to seek to form a legitimate organization among the workers for the purpose of collective bargaining. This bill declares that is wrong. It declares that the employee has the right to engage in collective bargaining, and it says, 'Mr. Employer, you must keep your hands off; you shall not use that effective power of dismissal from employment which you have and destroy the organization of the employees by the dismissal of one or more of your employees *when they are objectionable on no other ground than that they belong to or have organized a labor union.'* " Statement of Senator Walsh, 79 Cong. Rec. 7658. (Emphasis added.)

684

And further, the House Report on the bill stated:

"Nothing in this subsection prohibits interference with the normal exercise of the right of employers to select their employees or to discharge them. All that is intended is that the employer shall not by discriminatory treatment in hire or tenure of employment or terms or conditions of employment, interfere with the exercise by employees of their right to organize and choose representatives. It is for this reason that the employer is prohibited from encouraging or discouraging membership in any labor organization by such discrimination." H. R. Rep. No. 1147 on S. 1958, 74th Cong., 1st Sess. 19.

Considered in this light, I do not think we can sustain the Board's holding that the "hiring hall" clause is forbidden by the Taft-Hartley Act. The Board has not found that this clause was without substantial justification in terms of legitimate employer or union purposes. Cf. *Republic Aviation* v. *Labor Board, supra; Gaynor News Co. Inc.,* v. *Labor Board, supra.* Whether or not such a finding would have been supported by the record is not for us now to decide. The Board has not, in my view, made the type of showing of an actual motive of encouraging union membership that is required by *Universal Camera* v. *Labor Board, supra.* All it has shown is that the clause will tend to encourage union membership, and that without substantial difficulty the parties to the agreement could have taken additional steps to isolate the valid employer or union purposes from the discriminatory effects of the clause.[3] I do not think

---

[3] In connection with such clauses, the Board would have "The parties to the agreement post in places where notices to employees and applicants for employment are customarily posted, all provisions relating to the functioning of the hiring arrangement, including the safeguards that we deem essential to the legality of an exclusive hiring

that these two elements alone can justify a Board holding of an unfair labor practice unless we are to approve a broad expansion of the power of the Board to supervise nondiscriminatory decisions made by employer or union. Whether or not such an expansion would be desirable, it does not seem to me consistent with the balance the labor acts have struck between freedom of choice of management and union ends by the parties to a collective bargaining agreement and the freedom of employees from restraint or coercion in their exercise of rights granted by § 7 of the Act.[4]

I therefore agree with the Court that the Board's holding that the clause in question is invalid cannot be sustained.

MR. JUSTICE CLARK, dissenting in part.[1]

I cannot agree with the casual treatment the Court gives to the "casual employee" who is either unable to get employment or is fired therefrom because he has not been cleared by a union hiring hall. Inasmuch as the record, and the image of a hiring hall which it presents, are neglected by the Court, a short résumé of the facts is appropriate.

Lester Slater, the complainant, became a "casual employee" in the truck freight business in 1953 or early

agreement." These safeguards, which are also to be made contract terms, provide that:

"(1) Selection of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on, or in any way affected by, union membership, bylaws, rules, regulations, constitutional provisions, or any other aspect or obligation of union membership, policies, or requirements.

"(2) The employer retains the right to reject any job applicant referred by the union."

[4] Set forth in note 1 of the Court's opinion, *ante*, pp. 669–670.

[1] I agree with the Court's disposition of that part of the Board's petition seeking direct enforcement of the order of reimbursement.

1954. He approached an employer but was referred to the union hiring hall. There the dispatcher told him to see Barney Volkoff, an official of the union, whose office in the union headquarters building was some three miles away. Describing his visit to Volkoff, Slater stated that "[I] just give him [Volkoff] the money to send back East to pay up my dues back there for the withdrawal card, . . . and I went right to the [hiring] hall and went to work." However, this was but the beginning of Slater's trouble with the hall. After some difficulty with one of his temporary employers (Pacific Intermountain Express), the hall refused to refer Slater to other employers. In order to keep employed despite the union hall's failure to dispatch him, Slater relied on a letter from John Annand, an International Representative of the union, stating that "you may seek work wherever you can find it in the freight industry without working through the hiring hall." It was this letter that obtained Slater his employment with Los Angeles-Seattle Motor Express, where he was characterized by its dock foreman as being "a good worker." After a few months employment, the Business Agent of the union (Victor Karaty) called on the Los Angeles-Seattle Motor Express, advising that it could not hire Slater "any longer here without a referral card"; that the company would "have to get rid of Slater, and if [it] . . . didn't, that he was going to tie the place up in a knot, [that he] would pull the men off." Los Angeles-Seattle Motor Express fired Slater, telling him that "[We] . . . can't use you now until you get this straightened out with the union. Then come back; we will put you to work." He then went to the union, and was again referred to Volkoff who advised, "I can't do anything for you because you are out. You are not qualified for this job." Upon being shown the Annand letter, Volkoff declared "I am the union." On later occasions when Slater attempted to get clearance

from Volkoff he was asked "How come you weren't out on that—didn't go out on the picket line?" (Apparently the union had been on a strike.) Slater testified, "I told him that nobody asked me to. I was out a week. I thought the strike was on. The hall was closed. The guys told me there weren't no work." The landlady of Slater also approached Volkoff in an effort to get him cleared and she testified that "I asked Mr. Barney Volkoff what he had against Lester Slater and why he was doing this to him." And she quoted him as saying: "For a few reasons, one is about the P. I. E. [Pacific Intermountain Express] . . . [a]nother thing, he is an illiterate." She further testified that "he [Volkoff] didn't like the way he dressed. And he [Volkoff] fussed around and fussed around." He therefore refused to "route," as the Court calls it, Slater through the union hiring hall.

The Court finds that the National Labor Relations Act does not ban hiring halls *per se* and that therefore they are illegal only if they discriminate on the basis of union membership. It holds that no such actual discrimination was shown and that none is inferable from the face of the contract since it has a protective clause. Collaterally it holds, quoting Senator Taft, that hiring halls are "useful"; that they save time and eliminate waste and, finally, that the Court "cannot assume that a union conducts its operations in violation of law." [2]

I do not doubt for a moment that men hired through such arrangements are saved the expense and delay of making the rounds of prospective employers on their own. Nor do I doubt their utility to employers with varying

[2] Interestingly enough, the Board in its Twenty-Third Annual Report (1958) characterized its holding in *Mountain Pacific Chapter*, 119 N. L. R. B. 883, in the following language: "It may reasonably be inferred, the Board held, that a union to which an employer has so delegated hiring powers will exercise its power with a view to securing compliance with membership obligations and union rules." At p. 68.

employee demands. And I accept the fact that Congress has outlawed only closed shops and allowed hiring halls to remain in operation. But just as those observations are not, in the final analysis, relied upon by the Court today in reaching its decision, my acquiescence in them is only a prologue to my dissent from the remaining considerations upon which its decision actually rests. These considerations are dependent upon the construction given § 8 (a)(3) and I therefore first turn to that section.

Section 8 (a)(3) provides, in part, that it shall be an unfair labor practice for an employer

> *"by discrimination* in regard to hire or tenure of employment or any term or condition of employment *to encourage or discourage* membership in any labor organization . . . ." (Emphasis added.)

As I view this prohibition, which by § 8 (b)(2) is also applied to unions when causing or attempting to cause any employer to violate this section, two factors must be present before there is an unfair labor practice: (1) discrimination in the hiring or tenure of employees which is intended to, or inherently tends to, result in (2) encouragement or discouragement of membership in a union.

The word "discrimination" in the section, as the Board points out and I agree, includes not only distinctions contingent upon "the presence or absence of union membership," *ante,* p. 675, but all differences in treatment regardless of their basis. This is the "cause" portion of the section. But § 8 (a)(3) also includes an "effect" clause which provides that the intended or inherent effect of the discrimination must be "to encourage or discourage [union] membership." The section has, therefore, a divided structure. Not all discriminations violate the section, but only those the effect of which is encouragement or discouragement of union membership. Cf. *Radio*

*Officers* v. *Labor Board,* 347 U. S. 17, at 43: "Nor does this section outlaw discrimination in employment as such; only such discrimination as encourages or discourages membership in a labor organization is proscribed." Each being a requirement of the section, both must be present before an unfair labor practice exists. On the other hand, the union here contends, and the Court agrees, that there can be no "discrimination" within the section *unless it is based on* union membership, *i. e.,* members treated one way, nonmembers another, with further distinctions, among members, based on good standing. Through this too superficial interpretation, the Court abuses the language of the Congress and unduly restricts the scope of the proscription so that it forbids only the most obvious "hard-sell" techniques of influencing employee exercise of § 7 rights.

Even if we could draw no support from prior cases, the plain and accepted meaning of the word "discrimination" supports my interpretation. In common parlance, the word means to distinguish or differentiate. Without good reason, we should not limit the word to mean to distinguish in a particular manner (*i. e.,* on the basis of union membership or activity) so that a finding that the hall dispatched employees without regard to union membership or activity bars a finding of violation. The mere fact that the section *might* be read in the manner suggested by the union does not license such a distortion of the clear intent of the Congress, *i. e.,* to prohibit all auxiliaries to the closed shop, and all pressures on employee free choice, however subtly they are established or applied. Moreover, our interpretation in *Radio Officers* v. *Labor Board, supra,* supports this position. There we said:

> "*The unfair labor practice is for an employer [1] to encourage or discourage membership [2] by means*

*of discrimination.* Thus this section does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited. *Nor does this section outlaw discrimination in employment as such; only [1] such discrimination [2] as encourages or discourages* membership in a labor organization is proscribed." At pp. 42–43. (Emphasis added.)

The Court's conclusion is in patent conflict with that reasoning.

Given that interpretation of the word "discrimination," it becomes necessary to determine the class of employee involved, and then whether *any* differences in treatment within that class are present. The Board found the class affected by the union hiring hall to be that group which was qualified, in the sense of ability, to do the work required by the employer and who had applied for work through the hiring hall. Obviously, not all of those who apply receive like treatment. Not all applicants receive referral cards. Clearly, then, the class applying to the hiring hall is itself divided into two groups treated differently—those cleared by the union and those who were not. The next question is whether the contract requiring and endorsing that discrimination or differentiation is designed to, or inherently tends to, encourage union membership. If it does, then § 8 (a)(3) has been violated.

I begin with the premise that the Congress has outlawed the closed shop and that, as the Court pointed out, "[t]he policy of the Act is to insulate employees' jobs from their organizational rights," *Radio Officers, supra,* at 40. To test the contract here, I look to probable and anticipated "employee response" to it, *id.,* at 46, recognizing that "[e]ncouragement and discouragement are 'subtle things' requiring 'a high degree of introspective

perception.' " *Id.,* at p. 51. Just as in cases of his interference with protected activities, the escape value of the employer's "true purpose" and "real motive" is to be tested by the "natural consequences" and "foreseeable result" of his resort, however justifiably taken, to an institution so closely allied to the closed shop. I believe, as this Court has recognized, that "the desire of employees to unionize is directly proportional to the advantages *thought to be* obtained . . . ." *Radio Officers, supra,* at 46. (Emphasis added.) I therefore ask, "Does the ordinary applicant for casual employment, who walks into the union hall at the direction of his prospective employer, consider his chances of getting dispatched for work diminished because of his non-union status or his default in dues payment?" Lester Slater testified—and it is uncontradicted—that "He [the applicant] had to be a union member; otherwise he wouldn't be working there . . . you got to have your dues paid up to date and so forth." When asked how he knew this, Slater replied, "I have always knew that." Such was the sum of his impressions gained from contact with the hall from 1953 or 1954 when he started to 1958 when he ended. The misunderstanding—if it is that—of this common worker, who had the courage to complain, is, I am sure, representative of many more who were afraid to protest or, worse, were unaware of their right to do so.

Of the gravity of such a situation the Board is the best arbiter and best equipped to find a solution. It is, after all, "permissible [for the Board] to draw on experience in factual inquiries." *Radio Officers, supra,* at 49. It has resolved the issue clearly, not only here, but also in its 1958 Report which, as I have said, repeated its *Mountain Pacific* position "that a union to which an employer has so delegated hiring powers will exercise its power with a view to securing compliance with member-

ship obligations and union rules." At p. 68. In view of Slater's experience, for one, the idea is certainly not far-fetched. Despite the contract provision as to equal treatment between union and nonunion men after a minimum amount of seniority is obtained, we find here that Slater had to "pay up" his dues in 1953. Despite the seniority rule,[3] dispatch was often made, the record shows, due to favoritism by the employer. Despite the contract's solemn words, the uncontradicted evidence is that lack of intellect, taste in dress and failure to appear on a union picket line prevented an employee from getting a job, although he was a "good worker." Likewise, approaching a union official (who indignantly asserts "I am the union") with a letter from a union "higher-up" may result in loss of work. Such factors are infinitely more persuasive than the self-serving declaration of a union hiring-hall agreement.

However, I need not go so far as to presume that the union has set itself upon an illegal course, conditioning referral on the unlawful criterion of union membership in good standing (which inference the majority today says cannot be drawn), to reach the same result. I need only assume that, by thousands of common workers like Slater, the contract and its conditioning of casual employment upon union referral will work a misunderstanding as to the significance of union affiliation unless the employer's abdication of his role be made less than total and some note of the true function of the hiring hall be posted where all may see and read. The tide of encouragement may not be turned, but it will in part at least be stemmed. As an added dividend, the inherent probability of the free-wheeling operation of the union hiring

---

[3] The employers did not receive any seniority lists from the union and were unaware of whether this provision of the agreement was being properly administered.

hall resulting in arbitrary dispatching of job seekers would to some significant extent be diminished.

I would hold that there is not only a reasonable likelihood, but that it must inescapably be concluded under this record, that, without the safeguards at issue, a contract conditioning employment *solely upon union referral* encourages membership in the union by that very distinction itself. As the Board expressed it in *Mountain Pacific Chapter, supra,* at 896:

"[T]he very grant of work at all depends solely upon union sponsorship, and it is reasonable to infer that the arrangement displays and enhances the Union's power and control over the employment status."

A reasonable interpretation of the Act also demands that both the employer and the union be deemed violators. In determining that issue, I say that the Board is the best judge. I say that it has made an "allowable judgment." It is not for the courts to differently assess the hiring hall's "cumulative effect on employees" or job applicants, *Labor Board* v. *Stowe Spinning Co.,* 336 U. S. 226, 231. Its findings here should, therefore, "carry the authority of an expertness which courts do not possess and therefore must respect." *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474, 488.

Finally, let me say that the Board should not be hamstrung in its effort to enforce the mandate of the Congress that there shall be no closed shop. As Senator Taft stated on the floor of the Senate: [4]

"Perhaps [the closed shop] is best exemplified by the so-called hiring halls on the west coast, where ship-owners cannot employ anyone unless the union sends him to them. . . . Such an arrangement gives the

---

[4] 93 Cong. Rec. 3836; II Leg. Hist. of the Labor Management Relations Act, 1947, 1010.

union tremendous power over the employees; furthermore, it abolishes a free labor market. A man cannot get a job where he wants to get it. He has to go to the union first; and if the union says that he cannot get in, then he is out of that particular labor field."

That is where Lester Slater finds himself today. I therefore dissent.

MR. JUSTICE WHITTAKER joins in all except note 1 of this dissent, but would also add the reasons, respecting the Board's powers to make the order in question, that are stated in his dissent in No. 68, *Carpenters Local 60* v. *Labor Board,* decided this day, *ante,* p. 660.