778 F.2d 8
 120 L.R.R.M. (BNA) 3541, 250 U.S.App.D.C. 135,
103 Lab.Cas. P 11,719
 ROAD SPRINKLER FITTERS LOCAL UNION NO. 669 a/w United
Association of Journeymen and Apprentices of the
Plumbing and Pipefitting Industry of the
United States and Canada
(AFL-CIO), Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
ROAD SPRINKLER FITTERS LOCAL UNION NO. 669 a/w United
Association of Journeymen and Apprentices of the
Plumbing and Pipefitting Industry of the
United States and Canada
(AFL-CIO), Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 84-1224, 84-1225.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 13, 1985.
Decided Dec. 6, 1985.
 
 William W. Osborne, Jr., with whom Jonathan G. Axelrod, Washington, D.C., was on brief, for petitioner.
 Deborah M.P. Yaffe, Atty., N.L.R.B., of the Bar of the District of Columbia Court of Appeals, pro hac vice by special leave of the Court, with whom John G. Elligers, Atty., Wilford W. Johansen, Acting Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on brief, for respondent.
 Before WRIGHT, BORK and SCALIA, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SCALIA.
 SCALIA, Circuit Judge.
 
 
 1
 These consolidated cases present for review two separate decisions in which the National Labor Relations Board found that the Road Sprinkler Fitters Local Union No. 669 violated Sec. 8(b)(2) of the National Labor Relations Act ("NLRA"), 29 U.S.C. Sec. 158(b)(2) (1982), by causing employees to be fired or employment applicants not to be hired. In addition to the question of whether there was substantial evidence to support the Board's factual findings, the cases present the issues of the correct legal standard to be applied to such unfair-labor-practice determinations, and of the Board's authority to provide a remedy for a violation established by the evidence but not charged in the complaint.
 
 
 2
 * The principles of law and the facts common to both the cases before us are as follows:
 
 
 3
 With an exception not applicable here, Sec. 8(b)(2) of the NLRA prohibits unions from causing or attempting to cause employers to discriminate against employees so as to encourage union membership. The object of the provision is "to insulate employees' jobs from their organizational rights ... [by allowing] employees to freely exercise their right to join unions, be good, bad, or indifferent members, or abstain from joining any union without imperiling their livelihood." Radio Officers' Union v. NLRB, 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455 (1954) (footnote omitted).
 
 
 4
 The analysis that the Board and the courts apply to the implementation of this provision is laden with presumptions--and, like most analyses laden with presumptions, is highly artificial. Whether particular employer conduct caused by the union actually encourages union membership need not be proved by direct evidence, but may be presumed as "an inherent effect of certain discrimination." Id. at 51, 74 S.Ct. at 341. See also Local 357, International Brotherhood of Teamsters v. NLRB, 365 U.S. 667, 675, 81 S.Ct. 835, 839, 6 L.Ed.2d 11 (1961) ("Teamsters Local 357 "). Similarly, although it is said to be "the 'true purpose' or 'real motive' in hiring or firing" which is the test of the statutorily required intent to encourage union membership, that need not be shown by specific proof, since "[s]ome conduct may by its very nature contain the implications of the required intent," Teamsters Local 357, 365 U.S. at 675, 81 S.Ct. at 839. "[W]here employer conduct inherently encourages or discourages union membership" there comes into play "the common-law rule that a man is held to intend the foreseeable consequences of his conduct." Radio Officers' Union, 347 U.S. at 45, 74 S.Ct. at 338. While the legal battles over these issues are conventionally conducted on the battleground of whether there genuinely was "encouragement" of union membership, or "intent" of such encouragement, it should be clear enough that all union-procured employment action demonstrates the union's power and thus encourages membership; and that all union action is motivated by a desire, proximate or ultimate, to encourage membership. In deciding that in some cases the "inference" or "presumption" of illegal encouragement or intent to encourage will not be applied (it will not, for example, be applied to a union-procured firing to enforce contractual provisions of a valid hiring-hall agreement, see Teamsters Local 357, 365 U.S. at 675, 81 S.Ct. at 839) what is in reality afoot is, as Justice Harlan suggested in his concurrence in Teamsters Local 357, application of the principle that "the [National Labor Relations] Act was not intended to interfere significantly with those activities of employer and union"--whether or not those activities encourage, and are intended to encourage, union membership--which are sufficiently important (and perhaps sufficiently commonplace) means by which employers achieve "non-discriminatory business purposes," or by which unions "attempt[ ] to benefit all the represented employees." 365 U.S. at 682, 81 S.Ct. at 843. Having made that obeisance to the reality of the matter, we shall revert in the balance of our opinion to conventional analysis.
 
 
 5
 In faithful application of the case-law, the Board holds that conduct which causes firing or prevents hiring demonstrates the union's power so dramatically that its illegality is presumed. See United Brotherhood of Painters, Local Union No. 487 (American Coatings, Inc.), 226 N.L.R.B. 299, 301 (1976) ("Painters Local 487"); International Union of Operating Engineers, Local 18, 204 N.L.R.B. 681, 681 (1973) ("Engineers Local 18 "), enforcement denied on other grounds, 496 F.2d 1308 (6th Cir.1974). The union can rebut that presumption, however, by showing that its action " 'was necessary to the effective performance of its function of representing its constituency.' " Painters Local 487, 226 N.L.R.B. at 301 (quoting Engineers Local 18, 204 N.L.R.B. at 681). For this purpose, merely demonstrating that it would be "convenient for the Union, in enforcing its own internal rules of conduct, to have available an employment-related sanction" is insufficient. Engineers Local 18, 204 N.L.R.B. at 681.
 
 
 6
 Local 669 represents "sprinkler fitters," who specialize in the installation and maintenance of fire protection systems. It is a "road local," i.e., one with a national geographic jurisdiction, representing sprinkler fitters in 47 states and the District of Columbia. It is affiliated with the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO ("United Association"). The constitution of that organization, which Local 669 is required to observe, provides that a journeyman member of one affiliated local who seeks employment within the jurisdiction of another affiliated local (a "traveler") must file a "travel card" with the jurisdictional local before he begins work.
 
 
 7
 Under Local 669's 1979-82 collective bargaining agreement with the National Automatic Sprinkler and Fire Control Association ("NASFCA"), a multiemployer bargaining unit, employers were not limited to hiring members of Local 669 or locals affiliated with the United Association, but could also hire journeymen sprinkler fitters who belonged to other unions or to no union at all. However, journeymen who were not members of a union affiliated with the United Association were eligible for employment only after affidavits indicating that they had at least four years' experience in the industry had been presented to their employer and forwarded to Local 669.
 
 II
 
 8
 Appeal No. 84-1225 involves an unfair-labor-practice charge against Local 669 arising from the dismissal of an employee by American Automatic Fire Protection, Inc. ("American"), a signatory to the national agreement between NASFCA and the union. In mid-January 1982, American's president, Harry Horton, hired Raymond Woodruff, who was not a member of any union, to perform installation work. In response to Woodruff's expressed desire to join Local 669, Horton suggested that he contact the union, but conceal his present employment by stating that American had agreed to hire him after he joined. Soon after this conversation, Woodruff contacted J.R. Lively, Local 669's regional business agent. Lively said that he would not permit Woodruff to join the union unless he produced check stubs proving that he had been employed in the industry for at least four years.
 
 
 9
 Lively later found out that Woodruff was doing installation work for American, and on February 10 told Horton that that employment should cease immediately. When, on February 12, Woodruff once again contacted Lively to inquire about joining the Local, Lively questioned him concerning the number of hours he had been working for American and indicated that if Woodruff were forthcoming in his responses, he would probably be permitted to join. Woodruff gave evasive answers and Lively stated that he would prevent Woodruff from joining Local 669 because he was a "liar and a scab." J.A. 732.
 
 
 10
 In a meeting of Horton, Lively and (for some of the meeting) Woodruff held in Horton's office, Horton urged Lively to permit Woodruff to join the Local. Lively initially refused, stating that he considered Woodruff to be a "liar," J.A. 734, but later revised his position to state that Woodruff would not be accepted until a new contract had been negotiated and all of Lively's men had been employed. Lively told Woodruff "I'm not going to keep you from joining the Union," but "I'm not going to let you in until April 1st, or until after the strike, if we have a strike, is settled." J.A. 735. He suggested that Woodruff get letters detailing his employment history and have them ready when the impending strike was settled. In early March, Woodruff gave such letters to Horton, who gave them to Lively on Woodruff's behalf. Lively refused to look at them.
 
 
 11
 In mid-March, a Local 669 official discovered Woodruff installing fire protection equipment for American, and the union filed charges against the company. Lively informed Horton, however, that he would "keep the grievance on file" if Horton would "get rid of Mr. Woodruff completely." J.A. 811. The next day, March 19, Horton fired Woodruff, not only from installation work (which was all that the contract with the union covered) but from fabrication work that he had been doing as well.
 
 
 12
 On the basis of a charge brought by Woodruff, the General Counsel of the NLRB filed an unfair-labor-practice complaint. By decision and order issued June 17, 1983, an administrative law judge ("ALJ") found that the union had violated Sec. 8(b)(2). On January 11, 1984, a three-member panel of the Board affirmed the ALJ's rulings, findings and conclusions in all respects relevant here. After the Board denied its request for reconsideration, Local 669 sought review in this court pursuant to 29 U.S.C. Sec. 160(f) (1982).
 
 
 13
 It is uncontested that, because Local 669 conceded that it had caused Woodruff to be dismissed, the Board properly applied the presumption of violation of Sec. 8(b)(2). The union asserts, however, that it effectively rebutted the presumption by showing that it had acted to protect the integrity of the collective bargaining agreement between Local 669 and American, which was being violated because American was employing Woodruff even though he had neither joined the Local nor furnished affidavits establishing four years' prior experience. That justification, if established on the facts, would clearly suffice. See, e.g., Painters Local 487, 226 N.L.R.B. at 301. The Board, however, plainly rejected this view of things, adopting the finding of the ALJ that the union was motivated solely by a desire to preserve work for its current members.[1] Since motive is a question of fact, cf. Pullman-Standard v. Swint, 456 U.S. 273, 288, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982), we must affirm the Board if this finding is supported by substantial evidence on the record considered as a whole. See 29 U.S.C. Sec. 160(f).
 
 
 14
 In support of the finding the ALJ referred to, among other things, (1) Lively's refusal to permit Woodruff to join Local 669 unless he provided check stubs establishing four years' experience in the industry--a refusal that occurred before Lively had any idea that the collective bargaining agreement was being violated and that imposed a condition on membership in Local 669 even more onerous than the contractual provision governing the eligibility of nonunion workers; (2) Lively's subsequent statements that Woodruff would not be permitted to join Local 669 until all of Lively's men had obtained work or until after any strike that might occur was settled;[2] and (3) Lively's apparent disinterest in--on one occasion his affirmative refusal to receive evidence of--Woodruff's qualification to work for American as a nonunion employee. We think this adequate to support the conclusion that the union was not seeking to have Woodruff fired because he lacked the documentation of experience or union membership that the contract required, but rather in order to exclude him as a competitor for available work. The Board's order is supported by substantial evidence on the record considered as a whole, and must therefore be sustained.
 
 III
 
 15
 Appeal No. 84-1224 involves a charge that Local 669 committed an unfair labor practice by causing Best Fire Protection Systems, Inc. ("Best Fire"), another signatory to the NASFCA-Local 669 national agreement, to refuse to hire certain job applicants. In early 1980 Tom Holloway and his brother Ralph secured employment with Grinnell Fire Protection Systems Company, Inc. ("Grinnell"), also a signatory to the national agreement, on that company's installation job for the Comanche Peak nuclear power generator project near Glen Rose, Texas. Since they were journeymen members of Local 146, an affiliate of the United Association, they were required by the Association's constitution to deposit their travel cards with Local 669 before commencing work. Instead, they gave them to Grinnell's project foreman at his request. The foreman called the union's office to find out what to do with the cards, and was informed by Local 669's business agent, Billy Bob Littleton, that the union members should have sent the cards to Local 669's headquarters in Adelphi, Maryland. Littleton offered to go to the project site, collect the cards and forward them himself, which he later did.
 
 
 16
 In the summer of 1980, Grinnell laid off the Holloways in connection with a general reduction in force. In late February and early March of 1982, however, Grinnell rehired them. During the same period Grinnell hired Ernest Wilbur, also a traveler. The three did not deposit their travel cards with Local 669 before accepting employment, giving them instead to Grinnell. Some time within the next few weeks, Grinnell's project foreman telephoned Littleton to ask what he should do with the travel cards. Littleton told him to hold on to them and then telephoned Grinnell's construction manager, threatening to remove all Local 669 employees from the job unless Grinnell fired Wilbur and the Holloways. Grinnell did not accede to the demand. On March 22 Littleton filed internal union charges against the three employees.
 
 
 17
 On April 1, Local 669 began a nationwide strike against Grinnell and most other members of NASFCA. Grinnell arranged for Best Fire to take over its work at Comanche Peak during the strike. Butch Randall, the Best Fire official responsible for hiring, intended to hire the sprinkler fitters previously employed by Grinnell. He was told by Littleton, however, that before Local 669 would allow anyone to work the three travelers had to be dismissed. Although the Holloways and Wilbur appeared at the site seeking work, Best Fire refused to hire them. On May 16, following the termination of the nationwide strike, Grinnell reacquired the Comanche Peak project from Best Fire. All of the employees previously engaged by Best Fire were hired by Grinnell, neither the Holloways nor Wilbur among them.
 
 
 18
 On the basis of a charge filed by Ralph Holloway, the General Counsel of the NLRB filed a complaint alleging, among other things, that Local 669 had committed an unfair labor practice by causing Best Fire to refuse to hire Ralph Holloway, Tom Holloway and Ernest Wilbur. An ALJ decision, issued on May 3, 1983, found that Local 669 had violated Sec. 8(b)(2), and ordered it to compensate the Holloways and Wilbur for wages lost as a result of Best Fire's refusal to hire them. On February 28, 1984, a three-member panel of the Board affirmed the rulings, findings and conclusions of the ALJ in all respects relevant here, but expanded the remedy to include wages lost as a result of Grinnell's failure to hire the Holloways and Wilbur after it resumed work at Comanche Peak. Local 669 filed a petition for review in this court pursuant to 29 U.S.C. Sec. 160(f).
 
 
 19
 Local 669 does not deny that it prevented Best Fire from hiring the Holloways and Wilbur, and thus, as in the earlier case, does not contest the propriety of the initial presumption that it had violated Sec. 8(b)(2). It argued before the Board, however, that the presumption was effectively rebutted by the fact that its object in preventing the hiring was to enforce the rule requiring travelers to deposit their travel cards before beginning employment. The ALJ's opinion, affirmed by the Board, held that that object did not suffice to establish what rebuttal of the presumption would require--that Local 669's action was necessary to the effective performance of its representative function. It could be argued, with some support in the murky opinion, that this holding rested upon the proposition that the presumption can be rebutted only when the union's action is taken in connection with the operation of a lawful hiring hall. See United Association of Journeymen & Apprentices of the Plumbing & Pipefitting Industry, Road Sprinkler Fitters, Local 669 (Best Fire & Grinnell ), Cases 16-CB-1955, 16-CB-1995, slip op. at 7 (May 3, 1983) ("Best Fire & Grinnell ALJ Decision"); J.A. 23 ("Since there was no exclusive hiring hall, there was absolutely no legitimate basis for the Union's attempt ... to cause Best not to hire [the Holloways and Wilbur]...."). If the ALJ relied on this proposition, he was in error, as Board precedent clearly establishes that no such limitation exists. See Engineers Local 18, 204 N.L.R.B. at 681-82; Local Union 337, United Association of Journeymen & Apprentices of the Plumbing & Pipefitting Industry (Townsend & Bottum, Inc.), 147 N.L.R.B. 929, 935 (1964) (ALJ Decision). This issue is of no consequence to our decision, however. Since the ALJ's ultimate finding--that Local 669's resort to employment sanctions was not necessary to the effective performance of its representative function--is the only conclusion that could reasonably have been drawn from the record in this case considered as a whole, any error in the ALJ's analysis was harmless. See 5 U.S.C. Sec. 706 (1982).
 
 
 20
 Local 669 advances three arguments in support of its contention that its resort to employment sanctions was justified. First, it claims that Article 4 of the collective bargaining agreement between NASFCA and Local 669, to which both Grinnell and Best were signatories, imposed on both companies an obligation to abide by the travel-card rule--which would admittedly suffice, under Board precedent, to bring Local 669's action within the "effective-performance-of-representative-function" exception. There is not a grain of merit to that contention. In addition to the fact that Article 4 makes no mention of travel cards, even its more general provisions apply only to persons "not members of the United Association," and travelers by definition are members.
 
 
 21
 Second, Local 669 argues that, even if not contained within the collective bargaining agreement, the travel-card rule had become contractually binding on Grinnell as an "accepted practice" or "law of the shop"[3]--which would again admittedly suffice, under Board precedent, to justify union-imposed employment sanctions. The closest approach to evidence that the travel-card rule was either an accepted practice or the law of the shop at Grinnell was the testimony of Curtis Moore, Grinnell's project foreman on the Comanche Peak project from 1979 to June of 1981. Moore testified that after having been reprimanded by Billy Bob Littleton, business agent for Local 669, in March of 1980, for having collected travel cards from new workers, he thenceforth told new workers, "[w]hen they would come on the jobsite," that their travel cards should be mailed to union headquarters. J.A. 441. But this is no indication whatever that (as implementation of the union rule would require) Grinnell had agreed that travelers would not be employed unless they had first mailed in their travel cards. In fact it suggests just the opposite. So does Littleton's description of a 1982 conversation in which he remonstrated with Frank Moren, Grinnell's District Superintendent, concerning Grinnell's rehiring of the Holloways and the hiring of Wilbur (none of whom had filed their travel cards). In that conversation, according to Littleton, Moren correctly stated that he "could hire anybody he wanted to," J.A. 491, and Littleton did not assert that travelers could not be employed until they had filed their cards, and indeed only raised the whole matter "[b]ecause I didn't have very good communication with the guys on the job. I had to depend on Mr. Moren and Mr. Clakley to pass this information on.... I expected that [Moren] would pass [the proper procedure for deposit of travel cards] along to Louis Clakley, that he would pass it along to tell the guys to get it straight." Id. at 492-93. No witness asserted that, on even a single occasion, Grinnell had refused to hire a traveler who had not filed his card--though on a number of occasions Grinnell and Best hired or attempted to hire the Holloways, Wilbur and others knowing them to be in violation of the rule. On this record, the only possible conclusion is that there was no contractual agreement to enforce the travel-card rule.
 
 
 22
 Third, Local 669 contends that, even if Grinnell and Best did not contractually agree to deny employment to travelers who had not filed travel cards, that sanction was essential to Local 669's effective performance of its representative function because it was necessary to enable Local 669 to police other provisions that had been contractually agreed to--notably, those pertaining to the qualifications of employees and the requisite journeyman/apprentice ratio. Without the travel cards, the argument goes, the union would not know the make-up of the work force. This justification, likewise, is simply unsupportable on the record. As the ALJ noted, Local 669 had a number of alternative methods of enforcing the travel-card rule, including " '[i]nternal union discipline--fines, suspension, expulsion from membership, and the like.' " Best Fire & Grinnell ALJ Decision, slip op. at 7; J.A. 23 (quoting Engineers Local 18, 204 N.L.R.B. at 681-82). The evidence in the record is simply insufficient to support a conclusion that these methods would not have adequately served to enforce the travel-card rule. Even assuming, in other words, the essentiality of the travel-card filing procedure to the referenced contractual provisions, Local 669 failed to demonstrate the essentiality of the employment sanction to the effectiveness of that procedure.
 
 
 23
 Local 669 also argues that even if the Board properly concluded that it committed an unfair labor practice by causing Best not to hire the Holloways and Wilbur, the Board improperly expanded the remedy provided by the ALJ, requiring the union to compensate the Holloways and Wilbur for the wages they lost not only as a result of Best's failure to hire them on April 7 but also as a result of Grinnell's failure to rehire them in mid-May. We agree. It is true that, insofar as the record evidence indicates, the rehiring by Grinnell extended to all employees on Best's payroll, so that depriving the Holloways and Wilbur of that earlier status deprived them of the later rehiring as well. But responsibility for Grinnell's failure to hire was not charged, and neither the complaint nor the course of the hearing before the ALJ put Local 669 on notice that that would be at issue. We do not know, then, what the evidence would have shown had the union been afforded an opportunity to contest the point. "Even where the record contains evidence supporting a remedial order, the court will not grant enforcement in the absence of either a supporting allegation in the complaint or a meaningful opportunity to litigate the underlying issue in the hearing itself." NLRB v. Blake Construction Co., 663 F.2d 272, 279 (D.C.Cir.1981) (citations omitted).
 
 
 24
 The orders of the Board are enforced, except that requiring Local 669 to compensate the Holloways and Wilbur for wages lost due to Grinnell's failure to rehire them.
 
 
 25
 So ordered.
 
 
 
 [1]
 We cannot accept the union's contention that the ALJ (and hence the Board in adopting the findings of the ALJ) found a mixed motive. His opinion expressly stated that Local 669 was "only concern[ed that Woodruff was] a non-union employee doing [work that union members otherwise might have done]." Road Sprinkler Fitters, Local 669, U.A. (Woodruff), Case 16-CB-1958, slip op. at 8 (June 17, 1983) (ALJ Decision); J.A. 692 (emphasis added)
 
 
 [2]
 It is true, as Local 669 points out, that no charge of unlawful refusal to permit Woodruff to join the union was filed. But that does not render the evidence inadmissible for its probative value with regard to the charged offense
 
 
 [3]
 This argument is by its terms directed only at Grinnell; Local 669 does not contend, nor is there the slightest evidence to suggest, that the travel-card rule was an accepted practice or the law of the shop at Best Fire, the only employer as to which we sustain the Board's action in this case. It is doubtful, in other words, that this argument has any relevance