293 F.2d 187
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL 138, INTERNATIONAL UNION OF OPERATING ENGINEERS,
AFL-CIO, Zara Contracting Co., Inc., Frank
Marmorale, inc., Hendrickson Brothers,
Inc., Eastern Fireproofing
Company, Inc., Respondents.
 No. 263, Docket 26562.
 United States Court of Appeals Second Circuit.
 Argued March 7, 1961.
Decided July 25, 1961.
 
 Herman I. Branse, Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles and Herman I. Branse, Attys., N.L.R.B., Washington, D.C., for petitioner.
 
 
 1
 William Power Maloney, New York City (James G. Blake, Garden City, N.Y., William Power Maloney, New York City, of counsel), for appellant, Local 138, International Union of Operating Engineers.
 
 
 2
 Kay Kimmell, Mineola, N.Y., for respondent Zara Contracting Co., Inc.
 
 
 3
 Robert M. Blakeman, Valley Stream, N.Y., for respondent Hendrickson Bros., Inc.
 
 
 4
 Norman Roth, Max E. Greenberg, New York City, for respondent Eastern Fireproofing Co. Inc.
 
 
 5
 Before LUMBARD, Chief Judge, and WATERMAN and FRIENDLY, Circuit judges.
 
 
 6
 FRIENDLY, Circuit Judge.
 
 
 7
 The National Labor Relations Board petitions for enforcement of its order, 123 N.L.R.B. 1393 (1959), based on findings that Local 138, International Union of Operating Engineers, AFL-CIO, violated 8(b)(1)(A) and 8(b)(2) of the Taft-Hartley Act, 29 U.S.C.A. 158(b)(1)(A) and 158(b)(2), and that various employers violated 8(a)(1) and 8(a)(3), 29 U.S.C.A. 158(a)(1) and 158(a)(3), by maintaining a closed shop and an illegal union hiring hall, and by discriminating against certain men so as to discourage activities protected by 7, 29 U.S.C.A. 157.
 
 
 8
 The case grew out of a long-standing feud between rival factions of the Union, an organization of operators of heavy construction equipment--bulldozers, cranes, power shovels and the like--in Nassau and Suffolk Counties on Long Island. Since about 1954 a small number of determined members, perhaps ten of to total membership of some twelve hundred, whom we shall call, without implication, 'reformers,' have waged an intensive campaign to overturn Local President William DeKoning, Jr., and other incumbent officers, for what the reformers consider to be gross mismanagement and improper administration of union affairs. They have picketed the headquarters of the Local and of its International in Washington, D.C.; they have appeared before the Ethical Practices Committee of the AFL-CIO; they have printed articles in the press and have spoken over the radio. Their activities have engendered a considerable amount of irritation among the rank and file, culminating in the trial of several reformers on charges of bringing the Union into disrepute, and their expulsion from the Union in September, 1956. Moreover, on several occasions other members have refused to work with the reformers, and the latter claim that their reforming efforts have provoked a systematic program of discrimination against them by the Local itself, intended to deny them equal employment opportunities.
 
 
 9
 Since 1944 the Union has been party to a collective-bargaining agreement with Nassau and Suffolk Contractors' Association, Inc., which represents some 28 employers in the construction industry. Respondents Hendrickson Bros., Inc., and Frank Marmorale Co. are members of the Association; respondents Eastern Fireproofing Co. and Zara Contracting Co. are not. The agreement was to continue in force for three years, and thereafter for yearly periods unless timely notice of a contrary intention was given. It required the member companies to employ members in good standing of the Union, unless the Union was unable to supply the requested labor within twenty-four hours. In December, 1955, the Board, on charges by reform member Peter Batalias, filed a complaint against the Union and the Association. This resulted in a cease-and-desist order dated June 18, 1957, 118 N.L.R.B. 174, and ultimately in a consent decree in this Court, dated May 12, 1958, condemning the closed-shop clause and any arrangement whereby Union membership or Union clearance was a prerequisite to employment, restraining the Association and its members from interfering in the administration of the Union, and barring the Union and the Association from 'in any other manner' interfering with the exercise of rights guaranteed by 7. The complaint in the present proceeding, also based on charges brought by members of the reform group, is predicated on the alleged continuation of the forbidden practices, with the exception of employer domination, beyond the date the Trial Examiner's report was filed in the earlier case, on discrimination against the reformers in job referrals, and on allegedly Union-inspired work stoppages resulting in the discharge or transfer of reform members. A final charge, added during the trial, was of discrimination against non-Union workers in the administration of the Union welfare fund.
 
 
 10
 The Trial Examiner found the respondents had continued the illegal closed-shop provision but recommended that no new order be entered because the situation was covered by the earlier decree. He found neither discrimination in job referrals nor Union responsibility for the work stoppages. Respondent Zara, which has no contract with the Union, was absolved of any wrongdoing. Respondent Eastern, also with no contract, was found to have committed a 'Technical violation' by yielding to pressure from the Union to remove reformer Miller from his job, but no order was recommended because the Examiner did not believe such action 'would effectuate the policies of the Act.' As to respondents Hendrickson and Marmorale, the Examiner concluded that, apart from the illegal contract to which they were bound as Association members but as to which no order was recommended, the General Counsel had failed to sustain his burden of proof.
 
 
 11
 On exceptions by the General Counsel, the Board drastically modified the Examiner's findings and conclusions. Noting that the Union had not excepted to the finding that it had continued the illegal closed-shop provision, the Board affirmed this without discussing the evidence. Next the Board affirmed, on the basis of a notification by President DeKoning to the members, the Examiner's finding that a practice had continued whereby Union membership, Union referral, or a Union permit was required as a condition of employment, and ruled that the Union operated an exclusive hiring hall that did not satisfy the standards laid down in Mountain Pacific Chapter, 119 N.L.R.B. 883, 897 (1957). Findings were also made that the Union had violated 8(b)(1)(A) by threatening the reformers with the loss of job referrals for their anti-organization activities, by denying them a fair share of job referrals for the same reason, and by threatening reformer Wilkens with bodily injury; and had violated both 8(b)(1) (A) and 8(b)(2) by causing the latter's discharge and, through work stoppages, the discharge and transfer of reformers on several other occasions. Respondents Eastern, Hendrickson, Marmorale, and Zara were found to have discriminated against the reformers by yielding to the Union's demands, in violation of 8(a)(1) and 8(a)(3). Finally, the Union was held to have violated the Act by discriminating against permit men in the administration of the welfare fund. The Union was ordered, among other things, to cease and desist from the unfair practices found, to reimburse dues and fees exacted under the illegal contract, to make whole the reformers for any loss of pay suffered by reason of discrimination, and to end discrimination in the welfare fund. The respondent companies were similarly ordered to cease and desist, to join in the reimbursement of dues and repayment of losses, and to offer reinstatement to employees wrongfully discharged.
 
 
 12
 When the case was argued before us, Local 60, United Bhd. of Carpenters, etc. v. N.L.R.B., 1961, 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1, and Local 357, I.B.T., etc. v. N.L.R.B., 1961, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11, were awaiting decision. In the light of those decisions, the Board has withdrawn its request for enforcement of the portions of the order imposing the so-called Brown-Olds remedy of reimbursement of dues exacted during the allegedly illegal contract and condemning the exclusive union hiring hall. We have considered whether the Board's order rested upon the Mountain Pacific doctrine to such an extent that we ought remand for further consideration in the light of the Local 357 decision which condemned it, as we did in N.L.R.B. v. Lundy Manufacturing Corp., 2 Cir., 1960, 286 F.2d 424, where another Supreme Court reversal of the Board had supervened; we have concluded that most of the order is sufficiently supported by proper findings not affected by Local 357 to warrant enforcement without such a remand. See Communist Party v. Subversive Activities Control Board, 1961, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625.
 
 The Closed Shop
 
 13
 (1) Formal contract provision.
 
 
 14
 As stated above, Article IV of the 1944 collective-bargaining agreement provided that members of the Association should employ 'only such workmen as they may designate and prefer, providing such workmen are members in good standing of the Union * * *,' except when the Union proved unable to furnish men on twenty-four hours' notice. It is not denied that, as was held in the earlier proceeding, the application of such a provision would be a violation by the companies of 8(a)(3) and by the Union of 8(b)(2). The instant issue is whether in fact this provision was continued after the earlier case was decided.
 
 
 15
 The Trial Examiner found it was. The Board argues we cannot review this finding, as the Board did not, because no exception to it was taken by the Union. We disagree. Section 10(e) of the Act, 29 U.S.C.A. 160(e), is not applicable; the objection was urged in the Board proceedings. Neither is 102.46(b) of the Board's Rules, App. 29 U.S.C.A., providing that 'no matter not included in a statement of exceptions may thereafter be urged before the Board, or in any further proceedings,' unless this is read with a literalness we think unwarranted. In all save form the Union was the prevailing party before the Examiner; there was no occasion for it to except to adverse findings which did not affect his favorable recommendation. We do not construe the Board's rule as requiring a party satisfied with an examiner's recommendations to except to erroneous findings made in the course of discussion but not affecting the result; the ordinary principle is that 'A party may not appeal from a judgment or decree in his favor, for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree.' Electrical Fittings Corp. v. Thomas & Betts Co., 1939,307 U.S. 241, 242, 59 S.Ct. 860, 83 L.Ed. 1263. If the Board intends something different, it must say so more clearly than it has.
 
 
 16
 The Examiner's finding that the written collective-bargaining agreement was continued unchanged ignores the uncontradicted testimony of Union Secretary Sofield that the offending clauses were removed in the summer of 1956.[1] Although a finding based solely on the trier's disbelief of uncontradicted evidence is not necessarily invalid, here the Trial Examiner seems to have been unaware of Sofield's testimony; at least it was not mentioned in his report. The Union has moved that this issue be remanded for the Board to reconsider on the basis of certain documents which demonstrate beyond question that the contract was amended by exchange of letters during the summer of 1956, so as to substitute for the offending language a lawful union-security clause; in view of the uncontradicted nature of Sofield's testimony, the failure of the Union to produce these documents at an earlier stage of the proceedings is excusable. However, remand is unnecessary, since the finding that the illegal closed shop clause was not removed is without support in the record taken as a whole. The finding is set aside, and the motion to remand is denied.
 
 
 17
 (2) Informal arrangements.
 
 
 18
 On the other hand, a merely ceremonial expurgation of the offensive words from the written agreement would not avail, if in fact the practice embodied in the illegal provision was continued under the table. The Trial Examiner found that the General Counsel had not sustained his burden of proving the closed shop continued to be enforced, but the Board held otherwise, largely on the basis of President DeKoning's statement at the Union meeting in September, 1956, that the Union would continue to operate as before, despite the filing, a few days earlier, of the Intermediate Report in the prior proceeding recommending issuance of an order against it. The minutes of that meeting, transcribed by a court stenographer, reveal that DeKoning's concern was with the Examiner's recommendation that the Union be wholly disestablished for employer domination; DeKoning did not mention the finding as to the illegal closed shop clause. The Board also relies on a letter from DeKoning to the Union membership on September 21, 1956, a few days after the Intermediate Report, stating that 'until the N.L.R.B. has reviewed this case and has issued a final order, we shall continue to work under our contract with all general contractors * * *' This proves nothing; 'our contract' was the contract as it had been amended to omit the illegal closed shop provision. Most of the remaining evidence offered to support the finding relates to the prevalent, though not universal, custom in the industry of obtaining union clearance before hiring an engineer; at most, such evidence proves the existence of an exclusive union hiring hall. The sole evidence of continuing existence of the closed shop practice that is in any way persuasive is the testimony of Schurman, timekeeper for Eastern, which we recount below. While, as we later hold, this supports a finding of unlawful discrimination both by the Union and by Eastern with respect to the particular employee concerned, we doubt that, even with the Board's broad powers of inference drawing which we have recognized in N.L.R.B. v. Marcus Trucking Co., 2 Cir., 1961, 286 F.2d 583, this single incident would suffice to show a general illegal closed shop arrangement between the Union and Eastern, and surely it did not show one between the Union and other companies.
 
 Discrimination by the Union
 
 19
 (1) In job referrals.
 
 
 20
 The Board found sufficient evidence of discrimination by the Union in job referrals, violating 8(a)(1)(A) and 8(b)(2), in three factors, coupled with the Union's supposed exclusive hiring authority. Those were: (a) Numerous threats by Union officials that reformers would not be referred for jobs unless they mended their ways; (b) the expulsion of several reformers from the Union and their consequent loss of the use of the hiring hall; (c) testimony that several reformers, who had previously obtained all their jobs through the Union, were able to obtain only occasional employment from that source and were forced to apply for jobs on their own. Our review of the evidence, which we deem it unnecessary to detail, reveals ample support for these three subsidiary findings and the conclusion drawn from them.
 
 
 21
 (2) By threat of violence of Wilkens.
 
 
 22
 Again reversing the Trial Examiner, the Board found the Union had violated 8(b) (1)(A) and 8(b)(2) by threatening Wilkens with bodily injury on September 4, 1956.
 
 
 23
 Wilkens' testimony was as follows: Sofield had sent him to work at the Northfield Dock project, sixty miles from his home. When he arrived, he was met by Hutchinson, the master mechanic, and two others. Wilkens informed Hutchinson that Sofield had sent him to work, and Hutchinson said, 'We'll take good care of you on this job.' After further exchanges in the same vein, the two Union men approached his car and one said, 'Look at this crum here. We'll take good care of him out on this job.' Then Hutchinson said, 'Come on, you dirty 'B', give me your book and let's see your number.' Wilkens replied, 'If the attitude is like this, I am not going to stay here.' Hutchinson said, 'You better not stay here.' Wilkens left.
 
 
 24
 In contrast, Hutchinson's story was that Wilkens came to Northfield an hour and a half late, drove into the parking lot and then out again, announced that sixty miles was too far to travel every day, and quit the job.
 
 
 25
 The Trial Examiner made no finding as to what happened. The Board believed Wilkens because it felt Hutchinson's version improbable. We cannot reverse this finding on what surely is a 'question of fact,' 29 U.S.C.A. 160(e), even though the assessment of credibility was here made by the Board rather than by the Examiner. The remaining question is whether the Union is chargeable with the actions of Hutchinson and of the two other men. For reasons stated below, we uphold the Board's finding that it is.
 
 
 26
 (3) By causing the discharge of Miller.
 
 
 27
 In late January, reformer Miller went to work for respondent Eastern. He testified that one Vecchio told him that he could not work; that when he called the Union, Revere, Sofield's assistant at the Union hiring hall, said he was no longer a member and hung up on him; that Vecchio then called and asked the Union to send a man out to fill the job; and that Schurman, Eastern's timekeeper, told Miller he could not work since he had been expelled from the Union. Schurman testified he had called Revere, who said 'You know you can't employ an expelled man' and 'there is a man on the way, a union man.' Revere denied this, testifying that arrangements had been made for the Union to send a man the day before, and that he had told Schurman to hire whichever man he wished. Vecchio corroborated Revere as to the previous Arrangements; however, Vecchio admitted he had told Miller to stop working. The Board was warranted in believing Miller and Schurman and thus in holding the Union responsible for Miller's discharge.
 
 
 28
 (4) By work stoppages designed to prevent the reformers from obtaining or retaining employment.
 
 
 29
 A great portion of the testimony deals with a number of work stoppages, mostly in the summer of 1956, when the various reformers attempted to work along with members of the majority. The Trial Examiner refused to find the Union responsible for these work stoppages; the Board reversed and also held the several employers liable for yielding to Union pressure. If the sole issue were the responsibility of the Union, a quite summary statement of the evidence would suffice to show that the Board's findings of violations of 8(b)(1)(A) and 8(b)(2), were sufficiently supported. However, the issue as to the responsibility of the employers is closer, and we may as well tell here the full story of the three incidents for which employers as well as the Union were held liable.
 
 
 30
 (a) In late June or early July, reformer Bruder was working for respondent Marmorale on a project at Roosevelt Field. Frank Marmorale, president of the company, testified that Vorheese, his superintendent at Roosevelt Field, called and told him the men refused to work with Bruder. Marmorale told Vorheese to transfer Bruder to the company's yard so that work could continue. Bruder testified that Vorheese did transfer him, saying that master mechanic Kreischer had told Vorheese the job would close down if Burder did not leave. Marmorale testified he later complained to President DeKoning about the work stoppage, and the latter replied he could not help it if the men did not want to work with Bruder. There was also testimony as to a transfer of Bruder, inferably precipitated by Kreischer, in October.
 
 
 31
 (b) About July 5, reformer Batalias was operating a grader for John C. Peterson Co. as subcontractor for respondent Hendrickson on the Meadowbrook Parkway project. One Loftus, a member of Local 138 employed by Hendrickson, stopped working. He informed Verity, Hendrickson's assistant superintendent in charge of labor and equipment at Meadowbrook, that he refused to work with Batalias. Verity testified that he did not know the cause of the trouble, but that in order to avoid a fight between Loftus and Batalias, he asked Scholer, Peterson's job engineer, to transfer Batalias to another location. Batalias testified that Klein, Peterson's foreman, transferred him to another part of the Meadowbrook project. After finishing his assigned duties, Batalias returned, only to face a second work stoppage by Loftus and, after having been asked to get a cup of coffee, a third. Klein asked Batalias if he was trying to cause trouble, and told him 'Verity told me to get rid of you,' because Loftus refused to work with him. Batalias was sent to another project.
 
 
 32
 (c) On July 12, reformer John DeKoning, cousin but enemy of the Union President, was employed at Roosevelt Field by respondent Zara, a subcontractor for paving work. Kreischer, master mechanic for the entire Roosevelt Field project, told DeKoning the men would stop work if he remained. DeKoning called the Union hall; Revere replied no one in authority was around and there was no way he could help. Work was stopped. Samuel Zara, Vice-President of the company, came to the field and was told by the men they refused to work with John DeKoning. Brandenstein, master mechanic for Zara, was called to the field and told of the men's refusal. He offered to get replacements, but when he called the Union hall, Revere reported the chance was doubtful. According to DeKoning, Samuel Zara then told him 'I'll have to lay you off, John.' Brandenstein confirmed DeKoning's testimony, adding that he too had told John the latter was to be paid off. Zara denied he had fired DeKoning. He testified he told DeKoning he was in a tough spot, as he had $8,000 worth of asphalt that must be laid at once or become worthless, and that DeKoning quit voluntarily, saying he would leave on his own so the job might continue. Graziano Zara, father of Samuel and President of the company, testified that, shortly after this, DeKoning said he had walked off the job to avoid trouble. DeKoning further testified that one Carlson told him all the workers had been told by 'Browney' not to work while he was there; presumably 'Browney' was William Brown, a member of the Union whom DeKoning saw 'circulating around the project.' Gruetzner, superintendent for another contractor at Roosevelt Field, testified that when he asked way the engineers were not working, Kreischer told him they would not work while DeKoning was there; they were trying to contact President William DeKoning, and 'As soon as they got in touch with him and got instructions, why, they would act accordingly.'[2]
 
 
 33
 The Board found that the Union was responsible for the stoppages and therefore violated sections 8(b)(1)(A) and 8(b)(2) by causing and attempting to cause the transfer and discharge of reformers from their jobs because of their reform activities. The Union counters that, as the Trial Examiner found, the men acted on their own in refusing to work with the reformers and were not led to do so by the Union.
 
 
 34
 In addition to inferences from the testimony above summarized, the Board relies on a number of other incidents to demonstrate an overall plan of job discrimination by the Union. Daniell, a former auditor and trustee of the Union, recently convicted of stealing its funds, testified that on the first or second Friday in June several master mechanics, including Hutchinson and Kreischer, met at the Union hall. One of the mechanics, according to Daniell, asked Sofield what was the best thing to do if any of the reform group appeared on the job. Sofield told them 'to walk around and just spread it among a bunch of engineers and they would take care of it themselves.' Daniell had a somewhat hazy recollection of other contemporaneous events, and he had first mentioned this information a few days before he testified. Both Hutchinson and Brandenstein, also a master mechanic, denied that such a meeting was held. The Examiner did not determine the issue of credibility; the Board believed Daniell. Under the standards governing our review, we cannot say it was wrong.
 
 
 35
 A stenographic tape of the Union meeting on June 22, confirmed by witnesses for both sides, some of whom recalled the use of rather more colorful language, reveals that master mechanic O'Donnell asked whether anything in the Union Constitution required the men to work with the reformers. President DeKoning replied that nothing did, and that it was up to the individual member. Hutchinson, another master mechanic, then declared, 'I for one refuse to work with anyone of that bunch.' Two unidentified members echoed his sentiments. A member asked if such refusal was 'a violation of our contract.' Hutchinson answered 'If we refuse to work we get fired.' The Board contends the incident, on its face innocent enough, was staged by the Union officers to inform the members indirectly of the Union's approval of work stoppages, and that the effectiveness of this tactic was shown when the stoppages began a few days later, although there had been no such incidents in the past. The Union points to evidence of occasional refusals by members to work with reformers as early as the fall of 1955. However, the earlier events were not comparable to the flareup immediately after the June meeting, and we cannot say that the Board was not justified in drawing the inference that the conduct at that meeting, particularly when considered along with Daniell's testimony, was calculated by the Union to induce members to refuse to work with the reformers.
 
 
 36
 Further evidence to support the finding of Union responsibility is found in the participation of several master mechanics in announcing to the employers and to the reformers that the men would not work with the latter; in Marmorale's testimony that master mechanic Kreischer told him he should not have sent reformer Bruder to work; and in Gruetzner's testimony that Kreischer told him the men were waiting for instructions from President DeKoning as to what course to follow. Master mechanics perform the duties of union stewards and have responsibility for enforcing union rules and working conditions on the job. As said in N.L.R.B. v. Local 815, I.B.T., 2 Cir., 1961, 290 F.2d 99, 104, 'whether an agent has acted within the scope of his authority, actual, inherent, or apparent, is a 'question of fact' within 10(e) of the Labor Relations Act, 29 U.S.C.A. 160(e), as to which the finding of a trial examiner, adopted by the Board, can be set aside only if unsupported by substantial evidence on the whole record.' There is ample evidence here that the master mechanics were acting for the Union.
 
 Unfair Labor Practices of Employers
 
 37
 Section 8(a)(1) makes it an unfair labor practice for an employer 'to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed' in section 7. Among these are the right 'to form, join, or assist labor organizations' and also the right 'to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized' in section 8(a)(3). Section 8(a)(3) makes it an unfair labor practice for an employer 'by discrimination in regard to hire or tenure of employment * * * to encourage or discourage membership in any labor organization,' save as thereafter expressly permitted.
 
 
 38
 There seems to be no doubt that an employer who denies employment or promotion, discharges, or transfers because the applicant or employee has been expelled from a union for causes other than failure to tender dues and initiation fees or is otherwise in disfavor with the union because of activities protected by 7, finds himself in violation of 8(a)(1) and (3), even though he acts under the economic duress of a threatened work stoppage, N.L.R.B. v. Bell Aircraft Corp., 2 Cir., 1953, 206 F.2d 235, 237; N.L.R.B. v. Imparato Stevedoring Corp., 3 Cir., 1957, 250 F.2d 297, 302; N.L.R.B. v. United States Steel Corp., 3 Cir., 1960, 278 F.2d 896, 898. Whether the employee was discharged or only transferred is immaterial; no monetary loss to the employee is necessary to constitute a violation. N.L.R.B. v. Milco Undergarment Co., 3 Cir., 1954, 212 F.2d 801, 802, certiorari denied 1954, 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 697. In order to hold the employer, however, there must at least be proof that he knew he was acting for an impermissible cause. For 'The relevance of the motivation of the employer in such discrimination has been consistently recognized under both 8(a)(3) and its predecessor,' Radio Officers' Union, etc. v. N.L.R.B., 1954, 347 U.S. 17, 43, 74 S.Ct. 323, 337, 98 L.Ed. 455, or, as recently said by Mr. Justice Harlan, concurring, in Local 357, I.B.T., etc. v. N.L.R.B., supra, 365 U.S. at page 680, 81 S.Ct. at page 842, 'In general, this Court has assumed that a finding of a violation of 8(a) 3, or 8(b) 2, requires an affirmative showing of a motivation of encouraging or discouraging union status or activity.'
 
 
 39
 There was ample evidence to justify the Board's finding that John DeKoning was fired by Zara rather than having quit voluntarily; the resolution of the conflicting testimony on this was for the Board. Thus the accepted findings relevant to the responsibility of the employers are that Bruder was transferred by Marmorale about June 27 and in October, that John DeKoning was discharged by Zara on July 12, that Peterson, at the request of Hendrickson's superintendent Verity, transferred Batalias on July 5, all in response to work stoppages found to have been inspired by the Union; and that Miller was discharged by Eastern in January, 1957, because he had been expelled from the Union.
 
 
 40
 The last incident was clearly a violation of 8(a)(1) and 8(a)(3) by Eastern; the employer knew it was denying Miller employment because of a loss of union membership for a cause other than nonpayment of dues and initiation fees. Marmorale has not challenged the Board's order. Zara and Hendrickson contend, among other things, that there is no sufficient evidence they were chargeable with knowledge that the work stoppages which led them to discharge or transfer the reformers were caused by the intra-union feud rather than some other factor. We sustain the contention of Hendrickson and reject that of Zara.
 
 
 41
 We need not decide whether Hendrickson can be held to be an 'employer' of Batalias within 8 by virtue of the provision in its subcontract to Peterson obligating the latter not to employ men who may cause labor disputes and entitling Hendrickson to terminate if performance was prevented or hampered by such disputes. For the evidence was insufficient to hold Hendrickson in any event. This showed only that Verity, Hendrickson's superintendent, requested Peterson to transfer Batalias, because Loftus had told Verity he would not work with Batalias. Verity testified he made this request of Peterson in order to avoid a fight. The Board disbelieved this as 'improbable.' There was no evidence to show that Verity knew what the Union was doing in general or that Loftus was carrying out a Union plan, save for the mere fact that Verity was a Union member. The Trial Examiner, who heard the witnesses, found 'that the incident between Batalias and Loftus was a sudden occurrence after Batalias had worked with Loftus for a period of about 3 weeks without any incident of discord whatsoever, and also no other employee of Hendrickson or Peterson had objected to Batalias being on the job,' and that to accept the premise that every refusal to work with a reformer after the June 22 meeting was Union sponsored and was known to all Union members to be so 'would be to travel on conjecture only.' We agree, Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456.
 
 
 42
 In contrast, the work stoppage at Zara's Roosevelt Field job was a general one; a number of men refused to work. Before firing DeKoning, Samuel Zara learned that the men all refused to work with him. The Board was warranted in finding that Zara was on notice the Union had a hand in such a refusal. Moreover, Brandenstein, Zara's master mechanic and as such charged with certain supervisory duties on the company's behalf, who participated in the firing of DeKoning, had been part of the majority group at an altercation in the Union hall the previous December when, as three of the reformers testified, they were physically abused in the presence of Union officials, subjected to offensive language and told they would get no jobs until they stopped causing trouble; Brandenstein was aware of the Union's antagonism toward the reformers and, quite inferably, realized that the Union was behind the work stoppage. Zara is chargeable with his knowledge.
 
 
 43
 Thus respondents Eastern, Zara, and Marmorale were properly found to have violated 8(a)(1) and 8(a)(3) by yielding knowingly to union pressure to discharge or transfer employees illegally; respondent Hendrickson was not.
 
 Administration of Welfare Fund
 
 44
 It is clear that the Union's administration of the welfare fund was discriminatory against nonmembers. Secretary Sofield testified that each employer contributed an amount equal to 5% of the wages of every employee, whether Union or non-Union. Although contributions were made for permit men who were not members, no coverage was provided for them in the life-insurance policies purchased with the funds so contributed. This violated 8(b)(1)(A) and (2), Radio Officers' Union v. N.L.R.B. (Gaynor), 1954, 347 U.S. 17, 34-38, 46, 74 S.Ct. 323, 98 L.Ed. 455; Local 140, Bedding, Curtain & Drapery Workers Union, 109 N.L.R.B. 326, 329 (1954).
 
 Pre-Trial Statements
 
 45
 After the Board's decision, the Union moved for modification or, in the alternative, for a remand to the trial examiner, in view of the latter's denial of its request for the production of pretrial statements by reformer Wilkins and other Board witnesses. Since the Trial Examiner's report was basically favorable to the Union, we do not accept, for reasons stated above, the Board's contention that failure to except to his ruling deprived the Union of the right to raise the issue before the Board or here. N.L.R.B. Rule 102.87, since amended so as to no longer require the consent of the General Counsel, at that time required the consent of the General Counsel before release of such documents. We held in N.L.R.B. v. Adhesive Products Corp., 2 Cir., 1958, 258 F.2d 403, 406, that, prior to that amendment, the respondent was obliged to attempt to obtain pre-trial statements by complying with that rule; no such attempt was made here.
 
 The Order
 
 46
 Enforcement is denied, for lack of substantial evidence, insofar as the order pertains to the maintenance of a closed shop contract or arrangement between the Union, on the one hand, and Eastern or the Association, on the other.
 
 
 47
 In view of Local 357, I.B.T., etc. v. N.L.R.B. 1961, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11, all references in the order to the maintenance of an exclusive hiring hall and of an arrangement whereby clearance from or approval of the Union is required as a condition of employment, are deleted.
 
 
 48
 No finding of an unfair labor practice being sustainable against respondent Hendrickson Bros., the order is modified to omit that company.
 
 
 49
 In other respects the cease-and-desist portions of the order may be fully enforced, as may the portions of the order dealing with the administration of the Union's welfare fund.
 
 
 50
 In view of Local 60, United Bhd. of Carpenters, etc. v. N.L.R.B., 1961, 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1, as well as failure of proof that an unlawful closed shop arrangement existed, those paragraphs of the order imposing the so-called Brown-Olds remedy of reimbursement for dues collected during the existence of the alleged closed shop arrangement will not be enforced.
 
 
 51
 Those paragraphs requiring the Union and the employers other than Hendrickson to reimburse the injured reformers for loss of pay are enforced, both as to actual discharges (except as to Batalias, whom we have found not to have been unlawfully discharged), and as to lost job opportunities. However, the order should be modified so as to make the Union, which was plainly the prime wrongdoer, primarily liable and the employers, who were rather its victims, only secondarily so.
 
 
 52
 The portions of the order requiring respondent employers to offer reinstatement or retransfer to the reformers, five years after the events took place, are so manifestly futile as to the type of construction operations with which we are here concerned, that they will not be enforced.
 
 
 53
 The notices required to be posted will be modified in accordance with this opinion.
 
 
 54
 So ordered.
 
 
 
 [1]
 Our review of this long and complicated record has been made much more burdensome than it needed to have been by the failure of the parties to file a joint appendix, as permitted by our Rule 15(d), 28 U.S.C.A. The Board's appendix contains 394 printed pages, respondents' 448. By and large, they contain the testimony of the same witnesses, each side printing the portion deemed favorable to itself. In some instances the Board's appendix scarcely complies with the requirement of our Rule 15(b) that petitioner's appendix shall contain such parts of the record 'as are deemed necessary * * * fairly to present the issues.' A peculiarly indefensible one relates to the point here under discussion. The Board's appendix contains the following from p. 171 of the transcript:
 'The Witness (Sofield): This was the original contract signed with the Contractor's Association on April 8, 1944.
 'Q. (By Mr. Freeman) This is the contract that has been renewed from year to year at least up until the Board decision in the case in June 1957; is that correct? A. It has been amended several times.
 'Q. With the exceptions of amendments which, I believe, were wage rates; is that correct? A. That is right.'
 To find out what Sofield's testimony really was, we must turn to respondents' appendix for the continuation:
 'Q. That is the basic document which has been entered into between the Association and the union since 1944, at least (172) on up until June of 1957; is that correct? A. Well, there has been other amendments in changing the wording.
 'Q. When was the last time the contract was amended? A. I believe it was August 1956.
 'Q. What was the nature of the amendment? A. We had a clause in here--can I explain this?
 'Q. Yes. A. A very able attorney drew this up for us by the name of Mr. George Morton Levy. This one paragraph was put in here 'wherever provision herein may conflict with existing law, Federal or State, such conflicting provision shall be considered as amended in order to conform with such law.'
 'In previous cases the counsel for the Labor Board has said that it didn't mean anything, and that was only words put in there. But as far as we were concerned we lived up to it and we proved it in August of 1956 previous to the change in it. We changed a couple of paragraphs to conform with the Taft-Hartley Law, although we were conforming with it under that part there which the Labor Board said we wasn't. Why, I don't know.
 'Q. Specifically which paragraphs were amended? A. I wish I had known so I would have brought the new one with me.
 'Trial Examiner: Take your time.
 '(173) The Witness: The part that was changed was where there was a part in here that says, 'An employer shall hire none but union men--union members in good standing.'
 'Trial Examiner: When was that change made; do you remember, Mr. Sofield?
 'The Witness: We changed it through bona fide collective bargaining, and I think it was in August of 1956 after Mr. London's recommendation.
 'Trial Examiner: In other words, you had a closed-shop clause which you took out; is that right?
 'The Witness: Yes. We never lived up to it, or we changed it, rather, on account of this other paragraph in here.'
 
 
 [2]
 There was also testimony that on July 16 John DeKoning reported for work on another Zara job, a sewer project at Elmont, L.I.; that before he started, the other operating engineers on the job refused to work with him, that he went to the Union hall and complained to William DeKoning, Jr., without effect, and that he asked for other employment and was told there was none available. Zara was not held for this incident. There was also a short work stoppage at Elmont when Miller was working there on August 28 but not loss of employment occurred