LOCAL 138, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL-CIO, and its Welfare Fund and Trustees, William C. DeKoning, et al., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

NASSAU AND SUFFOLK CONTRACTORS ASSOCIATION et al., Respondents.

Nos. 375, 376, Dockets 27914, 27947.

United States Court of Appeals Second Circuit.

Argued May 29, 1963.

Decided July 8, 1963.

**132**

William Power Maloney and William J. Corcoran, New York City, on the brief for petitioners Local 138, and others.

Melvin J. Welles, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Judith Bleich Kahn, Washington, D. C., on the brief), for National Labor Relations Board.

Walter M. Colleran, New York City, as amicus curiae for New York State Building and Construction Trades Council, AFL-CIO.

Herman A. Gray and Edward C. Maguire, New York City, as amicus curiae for New York State AFL-CIO.

Before LUMBARD, Chief Judge, and WATERMAN and FRIENDLY, Circuit Judges.

LUMBARD, Chief Judge.

This case is another in the series of cases involving Local 138, International Union of Operating Engineers, and the employers with whom the union deals.[1] The members of Local 138 are "operating engineers," employed in the building and construction trades on Long Island. In proceedings before the National Labor Relations Board, the Board found (1) that the union had violated the National Labor Relations Act, 29 U.S.C. § 141 et seq., by maintaining a collective bargaining agreement with an employers' association which included provisions discriminating in favor of union members; (2) that the union had violated the act by operating a discriminatory hiring and job referral system and exacting an unlawful fee of nonmembers for use of the referral system; (3) that the union had violated the act by unlawfully discriminating against four individuals in job referrals and by threatening not to refer two of the same individuals and a third individual; (4) that the union, the Nassau and Suffolk Contractors' Association, the Welfare Fund in which both participate, and the trustees of the Welfare Fund violated the act by operating the Fund so as to discriminate against employees who were not union members and by denying benefits to one such employee; and that employer John C. Peterson Construction Co., a member of Nassau-Suffolk, violated the act by transferring an employee to a less desirable job and thereafter refusing to rehire him when the job to which he was transferred ended. Local 138, the Welfare Fund, and its trustees have petitioned this court to review and set aside the order of the Board. The Board has cross-petitioned for enforcement. We grant enforcement of some provisions, set aside others, and remand to the Board for further findings with respect to others.

Local 138 makes a broad attack on all of the proceedings below on the ground that Ralph Winkler, who acted as trial examiner, had been designated chief counsel to board member Gerald A. Brown on April 21, 1961, and he did not file his Intermediate Report until November 16, 1961. This, the union argues, violated § 4(a) of the act, which prescribes that "no trial examiner shall advise or

1. See National Labor Relations Board v. Local 138, International Union of Operating Engineers, 293 F.2d 187 (2 Cir. 1961) ; National Labor Relations Board v. Local 138, International Union of Operating Engineers, 254 F.2d 958 (2 Cir. 1958) ; Nassau & Suffolk Contractors Ass'n., 118 N.L.R.B. 174 (1957), enforced by a consent decree entered on May 12, 1958 (2 Cir).

consult with the Board with respect to exceptions taken to his findings, rulings, or recommendations." 29 U.S.C. § 154 (a). Although Winkler's appointment as chief counsel to board member Brown was announced in April, he did not take office until the day following the issuance of his report. We see no reason why Winkler's conclusions in his report should have been affected by his impending advancement. And while it may be that during the interim period, Winkler did act in some respects in a dual capacity, member Brown did not sit on this case. There is thus no reason to believe that Winkler played any part whatever in the deliberations of the Board. The union argues that for certain purposes the chief counsel to the board members sit as a committee and reach joint decisions. But it has shown no respect in which such collective deliberations could have affected the result here; so far as we have been informed, the counsel act collectively in phases of a proceeding having nothing to do with review of a trial examiner's report. In these circumstances, § 4(a) was not violated.

I. THE COLLECTIVE BARGAINING AGREEMENT WITH BUILDING TRADES EMPLOYERS ASSOCIATION.

■ In 1959, Local 138 entered into a collective bargaining agreement with the Building Trades Employers Association of Long Island, Inc., an association of employers in the construction industry. In 1960, another contract, effective until 1963, was executed. Both contracts included clauses which the Board found to be violations of § 8(b) (1) (A) of the act, 29 U.S.C. § 158(b) (1) (A).[2] The clauses in question provided (1) that "No member of the Union shall be subject to a physical examination in order to be employed"; (2) that union members shall be entitled to changes in shift at regular intervals; and (3) that union members shall be paid their accrued wages immediately upon termination of employment. In addition, the contracts provided that "In case any employee becomes ineligible under the rules of the Union and the employer is notified, then the said employer shall promptly discharge such employee."

The Board argues that by referring only to union members in the above clauses dealing with physical examinations, shifts, and payment of wages, the contract discriminates against nonmembers. Such discrimination, it is urged, goes beyond permissible limits in inducing employees to join the union. See Radio Officers' Union v. NLRB, 347 U.S. 17, 40–42, 74 S.Ct. 323, 335–336, 98 L.Ed. 455 (1954). The discharge clause is similarly unlawful, the Board argues, because the union rules provide that a member becomes "ineligible" for reasons other than nonpayment of lawfully exacted fees. For example, the constitution of the International, followed by Local 138, provides that a member may be expelled for subscribing "to the principles of communism or similar doctrines," etc.

We think that our decision in National Labor Relations Board v. Revere Metal Art Co., 280 F.2d 96 (2 Cir.), cert. denied, 364 U.S. 894, 81 S.Ct. 224, 5 L.Ed.2d 188 (1960), requires that enforcement of this provision of the Board's order be denied. We there indicated that the failure to include in a union security agreement an express negation of "a right of the union to seek the discharge of an employee after union membership had been terminated for reasons other than nonpayment of dues or initiation fees" was not by itself a violation of the act even though the union rules provided for expulsion from the union for such other reasons. Id. at 103. We pointed out that "the safeguard to the employee is postponed until discriminatory action is taken." Id. at 105. The Board has not pointed to any case of an employee who was discharged by his employer for failure to comply with union rules. As to that aspect of the case, Revere Metal Art, supra, is controlling. As to the other disputed

---

2. Since B.T.E.A. was not a respondent in the proceedings, the Board found no violation by it of the comparable provisions pertaining to employers.

clauses of the agreement, the Board has not shown or even attempted to show that any of them has been discriminatorily applied. For aught that appears, references to union members in the agreement are simply references, naturally phrased by a union entering into an agreement with an employer, to all employees. And, while we might be tempted, as we were in Revere Metal Art, supra, at 103, to construe the act to prohibit "the creation of a setting in which employees would think discrimination by the employer" was likely to result from nonmembership, the Board's proof has not gone even so far as to suggest that such a setting exists apart from pointing to the bare words of the agreement. We will not approve a finding of a violation which is based solely on words in an agreement which lend themselves as easily to a construction consistent with the act as to a construction which, if carried into effect, would result in conduct illegal under the act. Enforcement of this provision of the Board's order is denied.

## II. The Operation of the Hiring Hall and Exaction of Permit Fees From Nonmembers.

 The union's agreement with B.T.E.A. provides that the union "shall be the sole and exclusive source of referrals of applicants for employment." The inclusion in an agreement of a provision for an exclusive hiring hall is not by itself unlawful. Local 357, International Bhd. of Teamsters, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961). But a hiring hall may not be operated so as to discriminate against workers who are not members of the union. Id. The Trial Examiner and the Board found that the hiring hall operated by Local 138 did discriminate against nonmembers, and therefore violated § 8(b) (1) (A) and (2) of the act, 29 U.S.C. § 158(b) (1) (A) and (2). Union Secretary Verner Sofield, who ran the hiring hall together with another union official who was not called as a witness, testified that the order of referral was determined by seniority. So far as we can understand his testi-

mony, "Seniority" for this purpose meant the length of time during which a worker had been a union member in good standing or, if he was not a union member, the length of time after he had actually started work on a job to which he was referred by the hiring hall and during which he had paid the permit fees discussed below. If union dues or permit fees became more than ninety days in arrears, the worker lost all seniority theretofore acquired, and did not reacquire it when he again became paid up. The trial examiner, concluding that Sofield was "not entitled to belief on disputed matters," construed his testimony in the worst possible light and concluded that nonmembers were not dispatched "until the roster of all unemployed and otherwise available union members is exhausted." The Board apparently agreed with this conclusion.

 We think that the record does not contain substantial evidence to support a finding of such blanket discrimination. There is nothing in Sofield's testimony which can be so construed; disbelief of a witness does not furnish automatic license to assume that the worst is true. In addition, we are impressed by the absence of any suggestion of discrimination against nonmembers other than those referred to below, who were notorious as members of a "Reform Group," and thus rightly or wrongly placed in a separate category by the union. On the other hand, it is plain that even in its best light, Sofield's testimony evidences some discrimination against nonmembers. A nonmember who for the first time filed an out-of-work card and paid his permit fees apparently was not referred for employment until all union members had been referred. Once referred, the nonmember did acquire seniority, but he could get started doing so faster if he joined the union. In addition, the 90-day delinquency provision imposed the financial burden of maintaining permit fees on nonmembers who might not wish to work for a time but who expected to be seeking jobs in the future, lest they lose their seniority already acquired. Al-

though union members also had to keep up their payments, they presumably received benefits in addition to the right to use the hiring hall, while a nonmember who temporarily chose to remain idle would receive nothing in return for his payments.

 We do not say that any system of referral based on seniority is bad, but rather that the system used by Local 138, which resulted in impermissible pressures to join the union, was for that reason bad. The discrimination against nonmembers which is evidenced by the record sufficiently justifies the Board's order, which required the union to cease and desist from

"Maintaining any practice or enforcing any agreement, understanding, or practice with the Building Trades Employers Association and its members or with any other employer over whom the Board would assert jurisdiction, which unlawfully gives members of the local Union preference in job referrals or conditions referral or referral seniority upon good standing in the Union as either a member of the local Union or as a permit man."

Accordingly, this portion of the order will be enforced.

In addition to the above provision, the Board ordered Local 138 to "reimburse all individual nonmembers for permit or service fees unlawfully exacted from them as a condition of referral or employment with interest thereon at six percent per annum as set forth in the 'Remedy' section of this Decision and Order." The basis for this order was the Board's conclusion that "because the exclusive hiring and referral system was discriminatorily operated, the Respondent could not lawfully exact a fee for its use." Two of the four Board members who sat on the case would have found the assessment of permit fees discriminatory, and therefore unlawful, for the additional reason that they were in an amount equal to the monthly dues paid by union members. In their view, absent proof of a reasonable relationship of the fees charged to the cost of running the hiring hall, the assessment of fees equal to union dues is unlawful.

 We agree that the amount of the permit fees was excessive. The fees were charged solely for the use of the hiring hall. Yet of each $10.00 monthly payment, $2.00 was remitted by the local union to the International. While a union might under proper accounting procedures include in the cost of operating a hiring hall some reasonable percentage of the union's general expenses, the union has not argued before us that its charges to nonmembers were based on anything except an intention to exact from them the amount paid by members. This the union could not do under the guise of charging for its services as an employment agency. Compare National Labor Relations Board v. General Motors Corporation, 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670. While we think it likely, therefore, that some portion of the permit fees exacted since 1958 should be returned to the men who paid them, we think that the Board's order goes too far. We have rejected above the apparent finding of blanket discrimination. And while the limited discrimination which we have found to be supported by the evidence may have reduced in some degree the value of the referral services to nonmembers, the absence of any complaint except those made by members of the Reform Group indicates that some value was received by nonmembers for their fees. We do not have before us any information as to the number of nonmembers who paid fees or the total amount of money which the union would have to return if the Board's order were enforced as it now reads. But in view of the period of time covered and the possibly large number of men involved, the Board's order might be in the nature of a penalty which is prohibited. E. g., Local 60, United Bhd. of Carpenters v. N.L.R.B., 365 U.S. 651, 655, 81 S.Ct. 875, 877, 6 L.Ed.2d 11 (1961). We deny enforcement of this

portion of the Board's order and remand it to the Board for further findings. The Board should consider on remand what proportion of the fees which were paid were reasonably related to the value of the services provided by the union, having in mind also the cost to the union of performing such services. Any excess over that amount could properly be ordered returned to the men who paid it.[2a]

### III. DISCRIMINATION AGAINST PARTICULAR MEN.

The trial examiner found that Local 138 violated § 8(b) (1) (A) and (2) of the act by failing to refer employees Batalias, Nagle, Eichacker, and Christensen on the same basis as other men, and further violated § 8(b) (1) (A) by threatening employees Nagle, Christensen, and Wilkens that they would be denied referrals.[3] The Board sustained these findings. All of the above employees are identified in the union as members of a Reform Group; each has participated in one fashion or another in previous congressional or board proceedings against the union. All except Christensen are members of the union; Christensen was a "permit man" until July 1959, when he stopped paying the permit fee. The union does not deny that these men were not referred to jobs during the periods in question. It asserts, however, that they were not discriminated against and that their failure

to secure jobs was due to nonpayment of dues or (in the case of Christensen) permit fees, failure to file out-of-work cards, lack of qualifications for the jobs available, and so forth. Against this is the testimony of the men that they had done everything required of them and were otherwise qualified to obtain jobs, and would have done so but for the union's discrimination against them. All but one of the men testified to conversations with union officials, who were reported to have said in blunt language that the men would not be given jobs so long as their reform activities continued. The union officials who testified denied that these conversations took place.

We cannot overturn reasonable credibility determinations made by the trial examiner and accepted by the Board. The union's argument that it offends common sense to assert "that union officials, knowing of the propensity of these men for filing charges with the Board would repeat in almost identical language the very acts condemned by the Board," Brief p. 9, would have more force if Local 138 did not have a history of persistent violations. We grant enforcement of the Board's order that the union cease and desist from discriminating or threatening to discriminate against these men, and that it give appropriate notice to that effect. In addition, we grant enforcement of the order that the union, as directed by the Board, make Batalias,[4] Nagle, Eichacker, and Christensen[5]

---

2a. The Board will, of course, have in mind our rejection of the finding of blanket discrimination in determining whether such an order is warranted.

3. The trial examiner found that the evidence did not sustain the charge that Wilkens had in fact been denied referrals by the union.

4. Batalias was transferred in December 1958 from one construction job for the Peterson Construction Co. to another job of shorter duration. The Board found on substantial evidence that the transfer was due to his reform activities and found, contrary to the trial examiner, that Peterson rather than the union was responsible. Peterson has not appeared in this ap-

peal. We grant enforcement of the Board's order directed against Peterson, including the provision that Peterson make Batalias whole for any loss resulting from the discriminatory transfer. We grant enforcement also of the provisions requiring the union and Peterson, jointly and severally with the union primarily liable, to make Batalias whole for any loss caused by Peterson's failure to re-employ him later, this being primarily the responsibility of the union as was the union's attendant failure to refer him to other jobs.

5. In the case of Christensen, his failure to pay permit fees is the union's explanation for his lack of referrals. Since the per-

whole for any loss of pay rising from the discrimination against them.

## IV. THE WELFARE FUND.

Local 138 maintains agreements with the members of Nassau-Suffolk and B.T.E.A. as well as a large number of independent employers, whereby the employers make contributions to a Welfare Fund for the benefit of employees. The Fund, which provides a variety of life, health, accident and similar insurance and benefits, is managed by an eight-man board of trustees. Four members of the board are appointed by Local 138, three by Nassau-Suffolk, and one by B.T.E.A.; these organizations have the right to replace their appointees at will. In each case, the appointees are officials of the appointing body. The agreements provide that an employer shall pay an amount equal to five percent of all wages paid to operating engineers, whether the wages are paid to union men, permit men, or employees falling in neither category. Under the Fund's present rules, however, benefits are available only to union and permit men who have kept their payments, dues or permit fees, up to date. In addition, only employees who have worked a specified number of hours for a contributing employer are eligible for benefits.

 The restriction of the Fund's coverage to men who maintain their financial good standing with the union discriminates against nonmembers.[6] Radio Officers Union, supra, 347 U.S. at 34–42, 74 S.Ct. at 332–336, 98 L.Ed. 455; National Labor Relations Board v. Local 138, International Union of Operating Engineers, 293 F.2d 187, 198 (2 Cir. 1961). There is a further discrimination in the hours-of-work requirement, since, as we have found above, the opportunity to find work through the hiring hall was enhanced by union membership. We sustain the findings that the

union's participation in the Fund violated § 8(b) (1) (A) and (2) of the act, and that Nassau-Suffolk similarly violated § 8(a) (1–3). The Board's finding that the Fund and its trustees were agents of the union and Nassau-Suffolk is supported by the fact that all of the trustees were officials of and served at the pleasure of their appointing bodies. We therefore sustain the finding that the Fund and its trustees violated all of the aforementioned sections of the act. We grant enforcement of the relevant portions of the Board's order, and grant enforcement also of the order that the union and Nassau-Suffolk shall jointly direct the Welfare Fund to make employee Christensen whole for benefits denied him. Whether his ineligibility was based on nonpayment of permit fees or on his not having worked the required numbers of hours, the denial of benefits was, as we have indicated, based upon discrimination against him.

## V. THE FUTURE OPERATION OF THE HIRING HALL.

 The affirmative part of the Board's order requires that Local 138 "in conjunction with the Regional Director for the Second Region and subject to his approval, set up a nondiscriminatory hiring and referral system." In addition, the union is required to keep and make available to the Regional Director records showing the operation of the hiring hall and referral system. Although the Board has broad power to fashion remedies appropriate to the needs of each case, National Labor Relations Board v. Seven-Up Bottling Co., 344 U.S. 344, 346–347, 73 S.Ct. 287, 288, 97 L.Ed. 377 (1953), it may not require a union to set up a hiring hall. Local 357, International Bhd. of Teamsters v. NLRB, 365 U.S. 667, 676–677, 81 S.Ct. 835, 840, 6 L.Ed.2d 11 (1961). We have granted enforcement of the Board's order pro-

---

mit fees were excessive and, in any event, there was discrimination against permit men, Christensen's nonpayment of fees does not absolve the union of responsibility for his failure to find work.

6. Of course where a valid union security agreement is in effect and is enforced, the benefits of a welfare fund are properly limited to those who alone may be employed consistently with the agreement.

hibiting discrimination in the operation of the hiring hall, and this we think, is as far as the Board may go. Representatives of the Board should not be injected into the procedures by which the union, in conjunction with employers, establishes a referral system. Therefore, we deny enforcement of the provision requiring that the union set up a hiring hall. In view of the pattern of continuing discrimination in the operation of its hiring hall, however, we think that the Board was justified in directing the union to keep full records of its operations and make them available to the Board and its representative. Clause 2(a) of the Board's order is deleted. Clauses A(2) (b)–(c) are modified as follows:

"(b) Keep permanent records of its hiring and referral operation which will be adequate to disclose fully the basis on which each referral is made:

"(c) Upon request of the Regional Director of the Board or his agents, make available for inspection, at all reasonable times, any records relating in any way to the hiring and referral system."

We grant enforcement of clauses A(2) (b)–(c), so modified, and clause A(2) (d) of the Board's order.

So ordered.

FRIENDLY, Circuit Judge (concurring and dissenting).

Although I am in general accord with Chief Judge LUMBARD'S treatment of this complicated case, I disagree on one point of fact, and I think the question of law relating to the allegedly excessive level of the permit fees to be important enough to warrant an additional word.

I thoroughly agree with my brothers' conclusion that the Board's wholesale findings of discrimination against permit men in the operation of the hiring hall were not founded on substantial evidence.[1] But I see no sufficient support for their conclusion that a would-be permit man who for the first time filed an out-of-work card and paid his permit fees apparently would not be referred for employment until all union members had been—if "all" includes members joining the union thereafter, as I assume it does. The Board conceded in its opinion (fn. 5) that Sofield "at one point testified that as between Union men and permit men, he chose the one oldest in seniority, i. e., in accordance with the date the individual was initiated in the Union or began payments as a permit man," but it chose to "credit, as the Trial Examiner obviously did, Sofield's earlier testimony that he referred Union members before nonmembers." There was no such "earlier testimony." The earlier interrogation had related only to "hundreds of young fellows that come in and leave their name and address"; Sofield never said that a man who had begun to pay permit fees would be deferred in favor of a later joining member; and, if there had been any ambiguity, this was cleared up by the later testimony when the Examiner owned that he had "probably misunderstood your testimony earlier." Hence I find no basis for concluding that permit men who conformed to the hiring-hall's practices were treated worse than union men; the order can be supported only because of the reasonable conclusions as to the effect of the 90-day delinquency provision, the impermissibility of basing referrals solely on seniority of union membership or permit payments (which, however, bore equally on union members and on permit

1. I am disturbed by what seems a rather frequent practice of some of the Board's examiners, instanced here, of endeavoring to support findings by applying a "credible" rubber-stamp to one witness and a "not credible" one to another, with no explanation that will assist the Board or a reviewing court in ascertaining what led

to the use of the particular stamp. The respect which § 10(e) and (f) of the National Labor Relations Act commands the courts to give to the Board's findings of fact carries a correlative duty of explication for the Board and its examiners. See 4 Davis, Administrative Law Treatise (1958), § 29.06.

men), and the practice of charging the same fees to nonmembers as to members.

On this last point, I should have difficulty with a view that, in the absence of evidence that union membership entailed financial benefits (such as payments in the event of death or illness, strike benefits, etc.) not available to the permit men, equivalence of fees would constitute a violation of § 8(a) (3) by the employer or of § 8(b) (2) by the union. It is quite true that "discrimination" can be effected as well by giving more value for the same price as by charging a higher price for the same value. Cf. New York Central Railroad Co. v. United States, 207 F. Supp. 483, 490 (S.D.N.Y.1962). But what the National Labor Relations Act bans is not discrimination *simpliciter* but "discrimination in regard to hire or tenure of employment * * * to encourage or discourage" union membership, and I do not see how union membership is encouraged by charging the same price to nonmembers if all that they forego are privileges such as attending union meetings which they do not want. However, requiring nonmembers to pay an unreasonably high amount for the use of facilities operated by a union—as the identity of amount here strongly suggests and the 20% remittance to the International reinforces—infringes the right of employees, guaranteed by § 7, to refrain from assisting labor organizations—"except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3)." A union imposing such a requirement thus violates § 8(b) (1) and a cooperating employer offends against § 8(a) (1) unless the "except" clause is applicable.

Clearly the clause is not applicable as to Nassau-Suffolk, with which Local 138 had no agreement for anything other than referral during the period here at issue. And I reach the same conclusion with respect to B.T.E.A. The agreements between it and Local 138 provided that "The Union shall select and refer applicants for employment without discrimination against such applicants by reason of membership or nonmembership in the Union and such selection shall not be affected in any way by" union rules "except, however, applicant shall have required membership in the Union" thirty or, in the case of the 1960 agreement, seven days from the date of hiring. I do not pretend to know what this means—perhaps "required" is a misprint for "acquired"—but the evidence makes it clear that there was in fact no insistence on union membership. It is true that N.L.R.B. v. General Motors Corporation, 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963), declared broadly that "There is much to be said for the Board's view that, if Congress desired in the Wagner Act to permit a closed or union shop and in the Taft-Hartley Act the union shop, then it also intended to preserve the status of less vigorous, less compulsory contracts which demanded less adherence to the union"; and it could be argued that the arrangement between B.T.E.A. and Local 138 here in question, whereby the union referred for employment persons who had become members or persons who had not if they paid the same fees, was one of these "less vigorous, less compulsory contracts." But, apart from any question whether Local 138 required nonmembers to pay permit fees without awaiting the end of the 30 day period of § 8(a) (3) or, after 1959, the 7 day period of § 8(f), I doubt whether the permit men here had "the practical equivalent of union 'membership' " referred to in the General Motors opinion. The precise boundaries of the expansion of the letter of the "except" clauses of § 7 and § 8(a) (3) recognized in General Motors will have to be worked out by the Board and the courts; I am satisfied that the clause was not expanded so far as to include Local 138's agreement with B.T.E.A. as that was here applied.